THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH BROWN, Defendant-Appellant.

Second District   No. 2—86—1172

Opinion filed June 6, 1988.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Daniel D. Yuhas and David Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Robert J. Morrow and Robert F. Casey, State's Attorneys, of Geneva, and Kevin T. McClain, of Immel, Zelle, Ogren, McClain, Germeraad & Costello, of Springfield (William L. Browers and Robert J. Biderman, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

On May 13, 1986, defendant, Keith Brown, was charged by indictment with aggravated criminal sexual assault. On November 6, 1986, he was convicted in a jury trial. Defendant was sentenced to a term of 12 years' imprisonment.

On appeal defendant raises the following issues: (1) the trial court erred in admitting as a spontaneous declaration the details of a statement which the complainant made to Deputy Keith Smith; (2) the trial court erred in denying defendant's motion for discharge under the section 103—5 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1985, ch. 38, par. 103—5); and (3) the prosecutor committed reversible error in the trial proceedings. We reverse and remand.

### VICTIM'S TESTIMONY

Mary E. Butler, the alleged victim, testified that on April 26, 1986, she left her home during the early morning hours after arguing with her husband. By that time in the evening, Butler had consumed one-half gram of cocaine and two or three beers. At approximately 1:45 a.m., Butler was sitting in her car, which was situated in front of Aurora's American Legion Hall. Defendant approached Butler's car and introduced himself. After a brief conversation, he asked her if she would "like to go out and party a while and get some beer and stuff to drink?" Butler agreed, saying also that she wanted to drive her car.

They drove to several "after-sets" looking for a cocaine dealer named "Tennessee." She described "after sets" as parties held in private homes after the bars had closed. Defendant remained in the car while Butler went into the homes. At one after-set, defendant gave Butler $2 for the cover charge. Only Butler sought cocaine; defendant

did not use any drugs during the time he was with her.

While driving from party to party, defendant attempted to kiss Butler, but she rebuked him. Defendant apologized, and Butler continued driving.

Butler eventually found Tennessee and purchased one-half gram of cocaine from him. Butler drove to the apartment of her friend, Theresa Saulsberry. There she "free-based" the cocaine. Defendant remained in the car while Butler was in the apartment.

When Butler returned to her car, defendant said that if she wanted more cocaine, they could go to his brother's house in Elgin. Butler wanted more of the drug and agreed to go to Elgin. Defendant bought gas for Butler's car. Butler drove north on Mitchell Road and then proceeded north on Hart Road which she described as "dark and a back road."

While traveling on Hart Road, defendant asked Butler to pull over so he could "go to the bathroom." Butler stopped but kept the car running and the lights on. Defendant started to exit the car, then turned and tried to take the car keys out of the ignition. Butler fought with defendant for the keys.

Defendant slid across the seat, climbed on top of Butler, and began choking her with both hands. Defendant said that he should kill Butler. Defendant then opened the car door, and they tumbled to the ground. Defendant dragged Butler down an embankment and up a small hill.

Butler stopped fighting and said that she would do whatever defendant wanted. Defendant never said that he wanted to have sexual intercourse with her, but Butler assumed that was his intention. Butler could not remember whether she took off her own shorts or if defendant removed them, but she did recall removing her sanitary napkin.

After Butler and defendant had intercourse, he stood up and began yelling at Butler that she was trying to cheat him. Defendant told Butler to take him back to Aurora, where his car was located.

On the way back to Aurora, defendant continued to yell at Butler. After leaving defendant at his car, she attempted to follow him in order to memorize his license plate number; however, by the time Butler had circled the block, defendant was gone. Butler conceded that, as she dropped off defendant, she yelled that she was "going to make my old man kill your ass."

Butler searched for a police car for 10 to 15 minutes but was unable to locate one. She then went to Harper's Gas Station to telephone the police. Before making the call, however, Butler debated

whether to report the incident. She was not sure if she wanted to call the police because she was embarrassed and afraid of what her husband would say.

Butler ultimately telephoned the police. While waiting for their arrival, 10 or 15 minutes later, Butler returned to her car and discovered defendant's wallet on the front seat. She gave the wallet to the police. Kane County deputy sheriff, Keith Smith, took a statement from Butler and then transported her to the scene of the alleged incident and later to Mercy Hospital, where she was examined by a nurse. As a result of the struggle with defendant, Butler sustained minor injuries, including bruises and scratches.

Butler told police that she did not know defendant prior to April 26, 1986, but that she did know his sister-in-law. Butler did not tell the officer that she had purchased and ingested cocaine because she did not want him to think she was an addict. She also did not inform Officer Smith that she had argued with her husband earlier in the evening.

Butler admitted that she had taken cocaine several times in the year prior to April 26, but insisted that she was not an addict. She admitted that in the hours preceding this purported incident, she had consumed one gram of cocaine, for which she had paid $100.

## DEPUTY SMITH'S TESTIMONY

Deputy sheriff Keith Smith testified that on April 26, 1986, he was dispatched to the Harper Gas Station, where he took Butler's complaint. Smith observed that Butler had bits of grass in her hair. Her shirt was torn in the shoulder area, and she had bruises around her throat. He also observed some scrapes on her left hip. Butler appeared quite emotional and reluctant to talk with Smith, who did not think she was under the influence of drugs or alcohol.

Over defense counsel's strenuous and continuing objections, Deputy Smith testified to his interview with Butler. Butler told him that she met defendant at the American Legion Hall in Aurora. After a brief and casual conversation, they went looking for some parties, several of which Butler went to, while defendant stayed in the car. Following the last party, defendant asked Butler to take him to Elgin and stated he would give her $1.50 for gas. Whereupon they went to a gas station at Route 25 and Indian Trail in Aurora. After getting gas, they went northbound on Mitchell and Hart Roads. On Hart Road, defendant asked Butler to pull over so that he could relieve himself. After the car had stopped, defendant opened the passenger door but then abruptly turned and attempted to grab the keys out of

the ignition, saying that Butler wasn't going to leave him there. They struggled over the keys; defendant threatened to kill Butler. He then put both hands on her throat and began to choke her. In the struggle, defendant opened the driver's side door, whereupon they fell out onto the pavement. He dragged her to a grassy area and up an embankment, at which point Butler said that she would give him what he wanted. Butler started to remove her pants, which defendant forcibly took off her person. She removed her sanitary napkin, and they engaged in sexual intercourse. Defendant told her to drive him back to Aurora, which she did. After dropping defendant off on Bonner Avenue, Butler saw him walk to what she thought was a white Monte Carlo. Butler unsuccessfully attempted to follow his car and then drove to Harper's Gas Station, where she called the police. Waiting for the police, she discovered defendant's wallet in her car's front seat.

Deputy Smith further testified that following his interview with Butler, he accompanied her to the scene of the alleged sexual assault. There Smith found a barrette and sanitary napkin, both of which Butler identified as hers.

### DEFENDANT'S TESTIMONY

Defendant testified that in the early morning hours of April 26, 1986, he went to the American Legion Hall in Aurora, where he consumed two or three beers. About 1:45 a.m., as he was leaving, Butler gestured for him to come to her car. Defendant had been acquainted with Butler since they were children. He had seen her at two social occasions in the previous year. Butler asked defendant if he would like to "party," and he responded that he would and entered her car. Defendant laid his wallet on the front seat because he had no back pockets. Butler stated that she had to stop at some parties to purchase cocaine.

At the first party, Butler exited the car and looked for the vehicle of an acquaintance named "Tennessee," from whom she wanted to buy cocaine. Defendant remained in the car. Butler could not locate Tennessee, and she returned to the car and drove to another party.

Butler thought she saw Tennessee's car at the second party. She then kissed defendant and said she would be right back. Butler returned to the car a few minutes later, stating that she had been mistaken and that Tennessee was not at the party. Butler drove back to the first party and saw Tennessee's car. She again left defendant in the car while she went inside to buy cocaine. Defendant did not leave Butler's car while she bought the cocaine.

After purchasing a half gram of cocaine, Butler returned to the car. She drove to Theresa Saulsberry's apartment, where she planned to consume the drug. During the ride to Saulsberry's apartment, and at other times during the night, Butler fondled defendant, and he responded by kissing her. Defendant stayed in the car during Butler's visit to Saulsberry's abode. Butler returned 20 or 30 minutes later and told defendant that she wanted to find more cocaine. Defendant said that he had a brother in Elgin who might have some of the drug. Butler agreed to drive to Elgin; defendant purchased some gas for her car.

As she was driving, Butler continued to fondle defendant. Butler then pulled to the side of the road and caressed defendant repeatedly. Because the front seat of the car was uncomfortable, Butler suggested that they go outside. They went to the side of the road, and Butler undressed herself from the waist down. Defendant also undressed, and they engaged in sexual intercourse.

As they dressed, defendant asked what time it was. She said it was 4:30 a.m., and he said that it was too late to go to his brother's house. Angry at not being able to get more cocaine, Butler swore at defendant and said that he could walk back to Aurora. Defendant grabbed Butler as she started to return to the car, but did not know whether he tore Butler's shirt. Butler attempted to break defendant's grip and tried to kick him. They fell to the ground and fought with each other. After the fight, Butler and defendant both looked for her keys in the grass. When the keys were located, defendant and Butler got into the car and returned to Aurora. Defendant did not notice any scrapes or bruises on Butler.

After returning to the American Legion Hall, Butler continued to complain that defendant had not helped her get more cocaine. When defendant left Butler's car, Butler swore at him again and said that she was going to have her husband kill him. She then threatened to call the police, and defendant told her to call the police if she wanted to. He then left. At home, defendant undressed and saw blood on his underwear. He knew that the blood stains were due to Butler's menstruation. Defendant conceded that he did not tell police about his altercation with Butler out of fear of being charged with battery.

## LEGAL ISSUES

Defendant initially argues that the trial court erred in admitting as a spontaneous declaration the details of a statement made by the complainant to a police officer. At the trial, Butler testified that after she had engaged in sexual intercourse with defendant, they had

driven back to Aurora. She did not estimate the time it took to return to Aurora. After she dropped defendant off, Butler drove around the block and watched him get in his car. She unsuccessfully attempted to memorize his license plate. Butler then drove around for 10 or 15 minutes, looking for a police officer. When she could not find an officer, Butler went to a gas station to call the police. Before making the call, she deliberated as to what she should do. After making the call, Butler waited another 10 minutes for the police to arrive. She then gave the disputed statement during the course of a 20-minute interview.

Over defendant's multiple objections that details of Butler's statement to Deputy Smith were inadmissible hearsay, the court permitted him to testify as to the entirety of Butler's statement. The trial court did not indicate the basis for admitting the evidence, but it evidently adopted the prosecutor's view that the complainant's statement was admissible as a spontaneous declaration.

■ The elements necessary for the admission of a spontaneous declaration are as follows: an event which is so startling that it produces an unreflecting and spontaneous statement; the absence of time to fabricate; and a statement which relates to the occurrence's circumstances. *People v. Robinson* (1978), 73 Ill. 2d 192.

■ Defendant asserts that at least 25 minutes had passed between the occurrence of the alleged startling event and the statement. From the record, it appears that at the very least, 35 minutes passed between the time defendant got out of her car and Butler made her complaint to Deputy Smith.

Defendant argues that sufficient time had passed so that Butler's statement to the deputy could not be considered a spontaneous declaration. Butler stated that she spent an unspecified amount of time looking for her car keys. She further testified that it took 10 to 15 minutes to drive from the place on Hart Road where the alleged rape occurred to Aurora. She took the same route back to Aurora and dropped off defendant in town. Butler followed defendant attempting to get his license plate number for a number of minutes. She then drove around for 10 to 15 minutes, debating what she should do and then stopped at a gas station. Butler called the police, who arrived in about 10 minutes. Based on these facts, a conservative estimate of the time elapsed between the act of sexual intercourse and the statement to Deputy Smith was 35 minutes. It is entirely possible that 50 to 60 minutes had elapsed.

Defendant contends that in addition to the passage of time which negated the opportunity required for admission, Butler had not only

the opportunity to reflect but did actually pause to think over her situation. This, defendant asserts, further undercuts the State's contention that the entire conversation with Deputy Smith can be characterized as a spontaneous declaration.

The State responds that the challenged evidence was admissible under the prompt complaint and spontaneous declaration exceptions to the hearsay rule. Citing *People v. Damen* (1963), 28 Ill. 2d 464, the State argues that evidence of a prompt complaint is a well-recognized hearsay exception. Where, as here, a defendant is charged with a crime to which consent is a defense, evidence of the victim's prompt complaint should be admissible to overcome the adverse inference which would otherwise arise from her silence. If proof of such complaint were not permitted in cases of rape, the trier of fact might naturally assume that no complaint was made because nothing violent had occurred.

The State further argues that the necessary spontaneity is found in Butler's disputed statement. It is not, the State contends, the lapse of time between some exciting occasion and a statement that controls that statement's admissibility but the lack of spontaneity in light of the surrounding circumstances. (*People v. Parisie* (1972), 5 Ill. App. 3d 1009.) The State stresses Deputy Smith's testimony that Butler was very emotional and reluctant. Because of her emotionally distraught condition, Butler did not have the opportunity for reflection.

Defendant correctly points out that *People v. Damen* allows for the admission of the complaint but nothing more of the details of complainant's statement. The admission of Butler's entire statement under the "prompt complaint" exception was thoroughly improper. (*Robinson*, 73 Ill. 2d at 199.) Further, the State's argument that the statements were admissible under the spontaneous declaration exception fails under these circumstances. Butler's own testimony demonstrates that she had the chance to reflect on what had occurred and that she did indeed reflect upon her situation before she called the police. This pause to reflect negated the spontaneity of her statement to Officer Smith. (*People v. Smith* (1984), 127 Ill. App. 3d 622.) Thus, we conclude that Officer Smith's disputed testimony constituted inadmissible hearsay.

■ The State next argues that even if Butler's statements were not admissible under the spontaneous declaration or prompt complaint exceptions, the admission of these statements amounts to harmless error. It contends that Smith's testimony had merely a cumulative effect and that it played only a minor role in the State's case. The State points to the other evidence that supports the jury's determination,

*e.g.*, the defendant's wallet found in the front seat of complainant's car, and Butler's sanitary napkin and barrette found at the scene of the alleged rape. The State asserts that the testimony of Butler and the corroborative evidence were sufficient evidence upon which to find the defendant guilty.

Defendant counters that where, as here, there is a close question of guilt, the admission of the disputed evidence is seriously prejudicial to defendant. In support, defendant cites the following testimony adduced at trial. Defendant stated that the sexual intercourse had been consensual, that a fight ensued after he had refused to help Butler obtain more cocaine, and that she attempted to leave him in a rural area. Butler testified that she agreed to be with defendant, although she was married and had allegedly never met him before. She admitted consuming $100 worth of cocaine in the three hours before the incident. Butler was fully in charge of her car and chose to drive toward Elgin on Hart Road, which she described as a back road, rather than use the primary road. She also admitted quarreling with her husband and worrying about his reaction to her having been out and to her physical condition.

A similar situation was involved in *People v. Harris* (1985), 134 Ill. App. 3d 705. In *Harris*, consent was the central issue, and the defendant and complainant gave widely differing testimony. The court held that because the evidence was close and did not present a clear decision either way, the improper admission of a spontaneous declaration which corroborated the complainant's version was a "critical link" in the conviction and precluded a finding of harmless error. *Harris*, 134 Ill. App. 3d at 712.

We find that the jury faced a close question concerning whether defendant or Butler was more believable. The admission of Deputy Smith's complete reiteration of Butler's statement tended to make the jury perceive her testimony as more credible.

> "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." (*People v. Smith* (1985), 139 Ill. App. 3d 21, 33.)

That danger was clearly present in this case. The trial court committed reversible error in admitting that part of Deputy Smith's testimony which extended beyond Butler's initial complaint of sexual assault.

■ Next, defendant argues that the prosecutor committed revers-

ible error. Because of our decision regarding the issue of Deputy Smith's testimony, we do not need to deal with this final argument. Nevertheless, because this dispute over alleged prosecutorial errors may arise again on a retrial of this case, we shall rule regarding defendant's specific allegations of prosecutorial error.

Defendant argues that during his cross-examination, the prosecutor made an unsupported allegation that he was a cocaine user in the following colloquy:

"Q. Why did you think that you could get some cocaine at your brother's house?

A. He uses it, consumes it.

Q. Like you?

A. I do not do cocaine. I can't afford it."

It is improper for a prosecutor to raise unsupported allegations of misconduct by a defendant so as to substitute insinuation and innuendo for proof. (*People v. Strong* (1986), 151 Ill. App. 3d 28.) The record shows no evidence that defendant used cocaine. The prosecutor's veiled insinuation that defendant did use the drug was improper.

■ Next, defendant asserts that the prosecutor erred when he stated that Mary Butler's version of the incident should be believed because she had repeated her story consistently every time. The prosecutor argued that Butler had made six prior statements which were consistent regarding the alleged offense. A close reading of the record demonstrates only one consistent statement, *i.e.*, the statement to Deputy Smith, the details of which we have previously found were improperly admitted. In a case such as this where the credibility of the witnesses is so crucial in determining the legal issues, misstating or manufacturing the evidence as to the number of earlier consistent statements is unacceptable.

■ Next defendant argues that the prosecutor introduced a racial element into the trial. Specifically, defendant points to the following passage from the prosecution's final arguments.

"Who cares about this little black woman running around Aurora, mad at her husband, parking out on the street at 1:00 o'clock in the morning. Who cares about this person who wanted to party. Who cares about this person who is looking for cocaine. Who cares about somebody who took a stranger in their car.

∗∗∗

This defense, the idea behind it is to cheapen the idea that you and I and every single person in this society—

∗ ∗ ∗

[Defense objection overruled.]

Every single person in this society is entitled to the same protection of law, whether they're white or black, whether you like them or don't like them, even though they might have done things that you and I wouldn't do."

A number of Illinois courts have condemned attempts by prosecutors to raise racial considerations in closing arguments. (*People v. Lurry* (1979), 77 Ill. App. 3d 108.) In the instant case there was no reason for the prosecution to refer in any way to the alleged victim's race. The interjection of race into the closing argument was improper.

■■ Finally, defendant argues that he should not have been charged with delays caused by the State's failure to comply with the defense discovery motion and, therefore, the trial court should have granted his motion for discharge under the Code. (Ill. Rev. Stat. 1985, ch. 38, par. 103—5.) A delay is considered "occasioned by the defendant" if his acts have caused or contributed to actual delay (*People v. Donalson* (1976), 64 Ill. 2d 536), or where he has expressly agreed to a continuance on the record. (*People v. Cichanski* (1980), 81 Ill. App. 3d 619.) In this case, 138 days elapsed from the date of defendant's arrest to the date of the filing of a *pro se* motion for discharge under the Code.

Specifically at issue is which of the parties bears the responsibility for the 50-day time period between June 10 to August 1, 1986.

When the defense counsel verbally indicates to the trial court that he or she is agreeable to a continuance, he or she has been held to cause or contribute to any delay. (*People v. Jarnagan* (1987), 154 Ill. App. 3d 187.) In the case at bar, defense counsel verbally indicated at every juncture that he was agreeable to a rescheduling or continuance of the matters before the court. For instance, on June 10, the defense counsel indicated that a two weeks' continuance would "be sufficient." On June 24, defense counsel asked the trial court to "reset" the pretrial conference to July 10. On July 10, defense counsel, in response to the State's suggestion that they come back next week, stated "[T]hat's fine." On July 18, defense counsel stated that he thought that another date should be set in order to establish a trial date, and he specifically stated that the court should set that trial date.

On every occasion now complained of by the defendant, defense counsel indicated to the trial court that he agreed to or consented to the continuances. The trial court analyzed the transcripts before it and properly held that the 50-day extension was either agreed upon by or attributed to the defendant.

We find that the State was responsible for 86 days of delay, far short of the 120-day speedy trial time limit.

For the reasons stated above, we reverse the judgment of the trial court and remand this cause for further proceedings consistent with this opinion.

Reversed and remanded.

INGLIS and DUNN, JJ., concur.