THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM E. SOMMERVILLE, Defendant-Appellant.

Second District   No. 2—88—0696

Opinion filed January 19, 1990.

162

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, William Sommerville, was charged by information with aggravated criminal sexual assault. (Ill. Rev. Stat. 1987, ch. 38, par. 12—14.) Following a jury trial, defendant was found guilty of the offense and sentenced to eight years' imprisonment. Defendant filed a timely notice of appeal. We reverse and remand.

The following evidence was adduced at trial. The complainant, Valerie, testified that she, along with her two minor children, moved into a new apartment on June 19, 1987. At approximately 2 a.m. on June 20, 1987, the doorbell rang. Valerie testified that she went to the door and observed defendant standing outside. Valerie opened the door and defendant asked if Thomas was there. Valerie told defendant that Thomas did not live there and shut the door.

Valerie stated that she went back to her bedroom and telephoned her fiance, Anthony Bellino. While she was talking with Bellino, the doorbell rang again. Valerie ignored the doorbell, hung up the phone, and went to sleep. Some time thereafter, Valerie woke up and saw defendant in her bedroom. Valerie stated that she "screamed" and then defendant "jumped on top of me and put a pillow over my face." Defendant then told Valerie to keep quiet or he would kill her and her children. Defendant then removed Valerie's clothing and forced her to engage in sexual intercourse. Following the incident, defendant asked for and received Valerie's telephone number. Defendant told Valerie

that he had the keys to her apartment and that she would see him again.

After defendant left the apartment, Valerie telephoned Bellino and told him that she had been raped. Valerie also phoned the police and was taken to the hospital shortly thereafter. After being examined at the hospital and released, Valerie went back to her apartment with Bellino. Detective Mark Brictson of the Elgin police department arrived and informed Valerie that a "tap" would be placed on her telephone line.

Valerie testified that defendant did in fact call her later in the day. Valerie stated that defendant apologized for what he had done and asked if she would meet him at Cassiddy's Bar. Valerie agreed, but told defendant to call her back. Defendant did call back approximately 15 minutes later and was subsequently arrested.

On cross-examination, Valerie testified that she had seen defendant several times before June 20, 1987. Valerie stated that defendant approached her at a laundromat in March 1987 and introduced himself to her. Defendant also told her that he left a note at her apartment with his phone number on it, which Valerie did in fact receive. Valerie also stated that she saw defendant driving his car by her apartment "all the time." She admitted that she "recognized" defendant from these events, but did not actually "know" him.

Officer William Soulier of the Elgin police department testified that he responded to a police radio dispatch at 5:26 a.m. on June 20, 1987, concerning a sexual assault. Officer Soulier stated that Valerie was emotionally upset and crying when he arrived at her apartment. Valerie told Officer Soulier that she undressed, went to sleep, was awakened by a black man, and was forced to have sexual intercourse with him.

Roxanne Sronkowski, a registered nurse at Sherman Hospital, testified that she admitted Valerie to the hospital. Nurse Sronkowski stated that Valerie was emotionally upset when she entered the emergency room, but that there were no bruises, abrasions, or cuts on Valerie's body. The nurse did notice dirt marks under Valerie's chin.

The parties also stipulated that Dr. Kumar Alagappan examined Valerie in the emergency room and observed that Valerie was "tearful" during the examination. Dr. Alagappan did not notice any abrasions on her body. The doctor's final impression was "alleged rape."

It was further stipulated that Cynthia Barrera, a forensic scientist, would testify that the seminal material included in Valerie's Vitullo Rape Kit could have originated from defendant.

The State also presented the testimony of Anthony Bellino, Vale-

rie's fiance. Bellino confirmed that Valerie telephoned him around 1:30 a.m. on June 20, 1987, and told him that a man rang her doorbell and asked her some questions. Bellino told Valerie to call the police, but she refused. Valerie telephoned Bellino again at approximately 5 a.m. and told him that she had been raped by "[t]he guy who was at the door." Bellino then drove to Valerie's apartment and took her to the hospital.

Bellino further testified that he returned to the apartment with Valerie after she was released from the hospital. Bellino waited at the apartment for defendant to call, and defendant called later in the morning. Bellino stated that Valerie's entire body quivered and began to shake when she heard defendant's voice on the telephone. Bellino shared the telephone receiver with Valerie and heard defendant apologize for what he did to Valerie. Bellino also stated that defendant called back later in the morning. Following both of the phone calls, Bellino telephoned the police.

Defendant testified at trial and admitted having sexual intercourse with Valerie on the night in question but contended that it was consensual. Defendant stated that one of Valerie's neighbors told him about Valerie and that he wrote a note to Valerie telling her that he would like to meet her. The note contained defendant's phone number, which Valerie eventually called. Defendant and Valerie began to date in April 1987, approximately three weeks after Valerie called defendant. Defendant stated that his sexual relationship with Valerie began in April, and it continued for approximately three months. During this time, defendant and Valerie engaged in sexual relations on 15 to 20 different occasions. Defendant also stated that he accompanied Valerie and her children to movies, stores, and parks. In addition, defendant supplied cocaine to Valerie on several occasions.

Defendant further testified that his relationship with Valerie ended in June 1987 when he met and began living with Sharon Schmidgall. On June 19, 1987, Valerie saw defendant and informed him that she moved to a new apartment. Valerie told defendant that she had a date that night, but that he should come over later in the night. Defendant stated that he arrived at Valerie's apartment at approximately 1:30 a.m. on June 20, 1987.

After arriving at the apartment, defendant and Valerie sat around and talked, drank beer, and smoked marijuana. Defendant also stated that they engaged in sexual relations. Before defendant left Valerie's apartment at 6 a.m., she asked him to get her some cocaine. Defendant agreed to call Valerie later in the day.

Defendant telephoned Valerie around 11:30 a.m. and made an-

other call to her later in the day. Both calls were an attempt to arrange a cocaine sale. Defendant never went back to Valerie's apartment and was arrested later in the afternoon.

Defendant presented several witnesses at trial to support his testimony concerning his three-month relationship with Valerie. Juanita Robbins testified that she lived in the apartment next to Valerie and was acquainted with both Valerie and defendant. Juanita stated that she saw Valerie and defendant together on three to five different occasions and was aware that defendant spent at least one night at Valerie's apartment.

Luther Sommerville, defendant's brother, testified that he lived with defendant and became acquainted with Valerie because she was "constantly" calling defendant on the telephone.

Chester Douglas, a friend of defendant's brother, testified that he met Valerie at a carnival that she was attending with defendant. Douglas stated that he also saw Valerie at defendant's apartment on two different occasions.

Coreen Lewis, a former girlfriend of defendant, testified that she met Valerie at defendant's apartment in April 1987 and saw Valerie with defendant "about 10, 20 times, maybe more" at different locations. Lewis also testified that she saw Valerie in a grocery store after defendant was arrested and asked her why she accused defendant of raping her. Valerie responded that "if she couldn't have him then no one else was going to have him."

Joel Silva, a neighbor of defendant, testified that he delivered a note from defendant to Valerie requesting Valerie to telephone defendant. Silva stated that he later met Valerie at defendant's apartment and saw both of them together about 15 times.

Following closing arguments, the jury returned a guilty verdict on the offense charged. Defendant's post-trial motion was denied, and this appeal followed.

On appeal, defendant contends that: (1) the trial court erred in denying his motion to suppress his confession given in violation of his *Miranda* rights; (2) he was denied a fair trial when the trial court improperly admitted prior consistent statements; (3) the trial court erred in rendering a jury instruction which omitted the requisite mental state for the offense charged; (4) the trial court improperly considered aggravating factors at his sentencing hearing; and (5) he is entitled to credit for time served while in jail on an unrelated charge.

## MOTION TO SUPPRESS CONFESSION

Defendant first contends that the trial court erred in denying his

motion to suppress his alleged confession given that the police officers disregarded his invocation of his right to counsel. The following evidence was adduced at the suppression hearing.

Detective Mark Brictson testified that he obtained a search warrant on June 20, 1987, and went to Sharon Schmidgall's apartment. After giving a copy of the warrant to defendant and Schmidgall, Brictson and other officers searched the apartment and arrested defendant. Defendant was taken to the police station and was interviewed by Brictson. Brictson testified that he advised defendant of his *Miranda* rights before asking him any questions. Defendant did not request an attorney, and Brictson did not speak to any attorney before questioning defendant. On cross-examination, Brictson testified that defendant did not sign a form waiving his *Miranda* rights and did not sign any written statement or confession after the interview.

Detective James Barnes of the Elgin police department testified that defendant did not request an attorney and did waive his *Miranda* rights after being advised of each right. Barnes stated that defendant agreed to make a statement and did not request an attorney. In addition, Barnes did not recall speaking with an attorney before defendant was questioned.

Stephen Daday, an attorney, testified that he received a telephone call from Sharon Schmidgall on June 20, 1987, between 3:30 and 4 p.m. Daday stated that he called the Elgin police department shortly thereafter and spoke with Detective Brictson. Daday told Brictson that he would like to speak with defendant and also indicated that defendant would not make any statements without an attorney present. Brictson stated that he understood and allowed Daday to speak with defendant.

Daday testified that he did speak with defendant and told him that he should not make any statements to the police officers. Defendant stated that he understood. Daday also told defendant that the officers knew that defendant would not make a statement to them.

Defendant testified that he was not read his *Miranda* rights after he was arrested and questioned. Defendant told the officers that he was at Valerie's apartment but did not go into any details. Defendant stated that he then received a telephone call from Daday and was told not to make any statements to the police. Defendant told the officers that he would not make any statements to them. Defendant stated that he was then fingerprinted and later taken to Sherman Hospital for a blood test.

Following arguments, the trial court denied defendant's motion to suppress his confession. The court stated:

"There seems to be some confusion as to what time the various things happened. What happened first, what happened second.

The officers both testified unequivocally that there were Miranda statements, Miranda rights were given to the Defendant. The Defendant denies categorically that he received the Miranda statements or Miranda warnings.

Taking into consideration the credibility of the witnesses, the interest—and any interest of the witnesses as to the outcome of this hearing, any bias and prejudice of any of the witnesses regarding the outcome of the hearing, it will be the Court's ruling that the Miranda statements were given in a proper fashion, they were given in a timely fashion. There's no questioning of the Defendant after the alleged conversation with Attorney Daday, if such a conversation took place."

Defendant argues that the trial court erred in denying his motion to suppress for three reasons, namely, that (1) the trial court used an improper evidentiary presumption in assessing the credibility of the witnesses; (2) the evidence established that defendant invoked his right to counsel; and (3) the State failed to produce all material witnesses at the suppression hearing.

■ Initially, we note that the State has the burden at a suppression hearing to prove, by a preponderance of the evidence, that the defendant's statements were voluntarily given. (*People v. Clark* (1986), 114 Ill. 2d 450, 457; *People v. Purifoy* (1988), 172 Ill. App. 3d 980, 988.) The trial court's finding on a motion to suppress evidence, including statements, will not be disturbed on appeal unless that finding is manifestly erroneous. *People v. Evans* (1988), 125 Ill. 2d 50, 76-77, *cert. denied* (1989), 490 U.S. 1113, 104 L. Ed. 2d 1036, 109 S. Ct. 3175; *People v. Reynolds* (1983), 94 Ill. 2d 160, 165.

■ Defendant first contends that the trial court erred by employing an evidentiary presumption which automatically rendered defendant's testimony suspect simply because defendant was charged with a crime. Defendant points out that the court based its determination of defendant's credibility on the presumption that he was biased and prejudiced due to his interest in the outcome of the hearing. We disagree.

The trial court did not specifically indicate that defendant was the only witness with an "interest" in the outcome of the hearing. Instead, the court used the term "witnesses," apparently referring to defendant and the police officers. Certainly the police officers had an "interest" in the hearing, especially after considering that counsel for

defendant labelled the officers' job performance as the "most latent [*sic*] misuse of the handling of a confession" and "thoroughly botched." While we generally agree with defendant that his testimony is entitled to no less credibility than a police officer's testimony (see *People v. Grayson* (1980), 89 Ill. App. 3d 766, 773), we do not believe that the trial court improperly assessed the credibility of the witnesses at the suppression hearing.

Defendant next contends that he unequivocally requested an attorney before answering any questions from the officers. To support his contention, defendant notes that he testified that he asked Sharon Schmidgall "to call my attorney, Stephen Daday," after he was placed under arrest. Defendant stated that the arresting officers were in the room when he made the request, although both officers testified that they did not recall hearing defendant make the request to Schmidgall.

■ Under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, a defendant invokes his fifth amendment protections when he asserts "in any manner and at any stage of the process" his right to counsel. (*Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612.) However, not every reference to an attorney constitutes an invocation of the right to counsel. (*Evans*, 125 Ill. 2d at 75-76; *People v. Krueger* (1980), 82 Ill. 2d 305, 311, *cert. denied* (1981), 451 U.S. 1019, 69 L. Ed. 2d 390, 101 S. Ct. 3009.) In *Evans*, the defendant inquired into the availability of a public defender. Our supreme court held that such an inquiry simply referred to an attorney and was not an attempt to invoke his right to counsel. (*Evans*, 125 Ill. 2d at 74-75.) Furthermore, in *Krueger*, the court determined that the defendant's statement, "[m]aybe I need a lawyer," did not constitute an effective request for counsel. (*Krueger*, 82 Ill. 2d at 311.) The court noted that simply referring to an attorney, no matter how vague, indecisive, or ambiguous, does not automatically constitute an invocation of the right to counsel. 82 Ill. 2d at 311; see also *People v. Farrell* (1989), 181 Ill. App. 3d 446, 451 (defendant's intention to retain some unnamed attorney was an ambiguous assertion of his right to counsel); *People v. Tackett* (1986), 150 Ill. App. 3d 406, 419, *cert. denied* (1988), 487 U.S. 1234, 101 L. Ed. 2d 932, 108 S. Ct. 2898 (defendant's statements "I might be needing [an attorney]" and "I probably should" after told he could speak to an attorney held an insufficient manifestation of an invocation of his right to counsel).

■ In the case at bar, we disagree with defendant's contention that he successfully invoked his right to counsel. Assuming that defendant told Schmidgall to call his attorney, that request in no way communicated to the police officers that he wanted an attorney

present before any questioning could take place. As the State notes in its brief, such a statement could reasonably be interpreted as merely a way to find out if the attorney would be available to handle the case. As such, defendant's mere reference to an attorney was insufficient to successfully invoke his right to counsel.

Defendant next argues that the State failed to produce all material witnesses at the suppression hearing and also failed to explain their absence. In particular, defendant contends that the State was obligated to call the two police officers who transported defendant to the police station after he was arrested to testify at the suppression hearing.

In a motion to suppress a confession based on the voluntariness of the confession, the State must produce all material witnesses connected with the taking of the confession or explain their absence. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76.) However, section 114—11 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 114—11) requires that any objection to the failure of the State to call all material witnesses must be made to the trial court. (Ill. Rev. Stat. 1987, ch. 38, par. 114—11(d).) The failure to object specifically to the State's failure to call a witness or explain a particular witness' absence at the suppression hearing constitutes a waiver of the issue on appeal. *People v. Land* (1988), 178 Ill. App. 3d 251, 256-57; *People v. Johnson* (1988), 167 Ill. App. 3d 659, 668-69.

In the case at bar, defendant failed to object to the State's failure to produce all material witnesses at the suppression hearing. In addition, defendant did not raise the matter in his post-trial motion for a new trial. The only mention of the State's obligation to produce all material witnesses is in defendant's memorandum of law in support of his motion to suppress the confession. However, the memorandum simply recites the general proposition of law, without stating how the law relates to the specific facts in the present case. No mention is made as to which witnesses, if any at all, were material to the taking of the confession and were not produced at the suppression hearing. Consequently, we deem defendant's contention on this issue waived on appeal.

Defendant also asserts that the trial court's ruling on his motion to suppress was contrary to the manifest weight of the evidence. Defendant argues that his testimony at the hearing was unequivocal and was corroborated by attorney Daday's testimony, while the police officers' testimony was "vague, evasive, and riddled with uncertainty." However, it is the trial court's responsibility to assess the credibility of witnesses, and its decision will not be reversed on appeal

unless it is against the manifest weight of the evidence. (*People v. Bae* (1988), 176 Ill. App. 3d 1065, 1072-73.) After considering the testimony at the suppression hearing, including the alleged inconsistencies and contradictions, we do not believe that the trial court's decision is against the manifest weight of the evidence.

## ADMISSION OF EVIDENCE AT TRIAL

Defendant next contends that the trial court erred in allowing the State improperly to bolster Valerie's testimony by repeatedly introducing prior consistent statements concerning the details of the alleged crime. Defendant argues that the repeated introduction of these prior out-of-court statements deprived him of a fair trial and constitutes reversible error.

■ The State responds by arguing that defendant waived any claim that the evidence of prior consistent statements constituted reversible error. Defendant did not object to the allegedly improper testimony at trial and also did not raise the issue in his post-trial motion. The failure to raise an issue at trial and in a post-trial motion constitutes waiver of the issue absent plain error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 185-86.) The doctrine of plain error may be invoked in criminal cases where the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial. (*People v. Merideth* (1987), 152 Ill. App. 3d 304, 314.) A significant purpose of the plain-error exception to the waiver doctrine is to correct any serious injustices which may have denied the defendant a fair trial, even if the error was not properly preserved for appellate review. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576.) We decline defendant's invitation to review this case under the plain-error doctrine. The plain-error exception to the waiver rule is a narrow and limited exception and should not be applied in every case in which some error has occurred in the trial court. *People v. Jackson* (1981), 84 Ill. 2d 350, 359; *Merideth*, 152 Ill. App. 3d at 314.

■ Defendant also argues that he was denied the effective assistance of counsel given that his attorney failed to object to the inadmissible evidence at trial. In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court established a two-prong test to determine whether a defendant was denied effective assistance of counsel. A defendant must show (1) counsel's conduct was professionally deficient; and (2) but for the deficiency, there is a reasonable probability that the result of the proceeding would have been different. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) The *Strickland* standard has been adopted

in Illinois. *People v. Albanese* (1984), 104 Ill. 2d 504, 526.

�ం▬▬▬▬ Addressing the merits of defendant's argument, we agree that defendant was denied the effective assistance of counsel in that counsel failed to object to the State's improper bolstering of Valerie's testimony with prior consistent statements. We perceive no strategic reasons for allowing the hearsay testimony to come in at trial, and given that this was a "close" case even with the statements in evidence, it would be difficult to accept the State's position that the error "did not result in a verdict that defendant would not have otherwise received." As such, defendant does appear to meet the requirements of both prongs of the *Strickland* test on this particular issue.

At trial, Valerie's fiance, Anthony Bellino, testified that Valerie telephoned him immediately following the alleged sexual assault. He testified that Valerie called him and told him that she had been raped. Bellino asked her who did it, and Valerie responded:

> "[B]y the guy, he was at my door, the black guy. Then, she proceeded, he was in my room, he was in my room, he raped me, he threatened the kids, he threatened my life, I don't know what to do.

> \* \* \*

> And we went back and forth because she kept repeating he was in my room, he raped me."

Officer Soulier testified that Valerie told him that she woke up and:

> "[F]ound a black male subject standing next to her. She started to scream, the subject took a pillow and put it over her face and jumped on top of her and started mentioning something about her children.

> \* \* \*

> She said then the subject then said something to the effect if you be quiet I'll go easy on you, something to that effect, then he proceeded to have sexual intercourse with her in the bed."

Nurse Sronkowski testified that Valerie told her that she had been raped, stating that "a black man came to her room, tried to suffocate her with a pillow and had raped her vaginally, penetrating her one time and ejaculating into her." In addition, the parties stipulated that Dr. Alagappan would testify that Valerie told him that a man walked into her apartment, covered her face, and had intercourse with her.

The prosecutor summed up the testimony in his closing argument by stating:

> "What corroborates the facts of what [Valerie] says, the fact that it's true?

Well, what did she do afterwards? *** [S]he called her boyfriend and told him what happened, that she was raped. And remember what Tony Bellino told you. He told you how Valerie kept saying to him he was in my room, he raped me.

* * *

Valerie told [Nurse Sronkowski] that she was attacked by a male black with a pillow put over her face, over her head.

* * *

Officer Soulier told you that Valerie *** told him that the attacker put a pillow on her face, that she was suffocating.

*** Nurse Sronkowski *** told you that Valerie told her that the attacker put a pillow over her face, she thought she was going to suffocate."

Defendant contends that this testimony, along with the prosecutor's comments during closing arguments, deprived him of a fair trial. The State argues that the challenged evidence was properly admitted as an exception to the hearsay rule, specifically under the prompt complaint, spontaneous declaration, or treating physician exceptions. We will address each of the State's arguments in turn.

Initially, we note that the general rule is that a prior consistent out-of-court statement of a witness is not admissible to corroborate his or her testimony at trial relative to the same subject. (*People v. Clark* (1972), 52 Ill. 2d 374, 389.) However, the State correctly points out that there are exceptions to this general rule of inadmissibility of prior consistent statements. One such exception is the "corroborative complaint" or "prompt complaint" exception. Under this exception, a witness may testify that the alleged victim made a complaint stating that she was raped. (*People v. Damen* (1963), 28 Ill. 2d 464, 472-73.) However, only the fact that a complaint was made, and not the details of the complaint, may be admitted into evidence. (*Damen*, 28 Ill. 2d at 473.) Courts have determined that the details of the complaint are unnecessary given that the purpose of the exception is to negate the presumption arising from silence concerning the alleged rape. *Damen*, 28 Ill. 2d at 473; *People v. Russell* (1988), 177 Ill. App. 3d 40, 46-47; *People v. Evans* (1988), 173 Ill. App. 3d 186, 199.

Defendant does not dispute the fact that Valerie made a "prompt complaint," but instead argues that the testimony was improper because the statements included details of the alleged rape. We agree. The statements made in the case at bar went far beyond simply showing that a complaint had been made. The statements identified the perpetrator of the offense and also provided details of the alleged of-

fense. Consequently, the statements concerning the identity of the perpetrator and the details of the offense were improper and should not have been admitted at trial under the "corroborative complaint" exception.

The State also contends that the statements, if not admissible under the "corroborative complaint" exception, were properly admitted under the "spontaneous declaration" exception to the hearsay rule. In order for a statement to qualify as a spontaneous declaration or utterance, three factors must be present: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Jones* (1985), 105 Ill. 2d 342, 354; *People v. Robinson* (1978), 73 Ill. 2d 192, 199.) Courts have noted that the lapse of time between the event and the statement does not control whether the statement is admissible, but rather the inquiry is whether the statement was spontaneous in light of the surrounding circumstances. (*People v. Brown* (1988), 170 Ill. App. 3d 273, 281; *People v. Parisie* (1972), 5 Ill. App. 3d 1009, 1028.) The *Parisie* court stated that factors to be taken into consideration include length of time, condition of the declarant, influence of intervening occurrences, presence or absence of self-interest, and the nature and circumstances of the statement. *Parisie*, 5 Ill. App. 3d at 1029-30; see also *People v. Van Scyoc* (1982), 108 Ill. App. 3d 339, 341.

In the case at bar, the statements related to the circumstances of the occurrence (the alleged sexual assault). However, the problem with the statements is that they were the result of a series of questions, thus expressing doubt as to whether the statements were actually "spontaneous." Valerie's fiance, Anthony Bellino, testified that she called him and told him that she had been raped. Bellino stated that he then asked her a series of questions, including "What's wrong?" "By who?" "Are you okay?" and "is he there with you now?" Bellino stated that Valerie responded to each of the questions, and she kept repeating, "he was in my room, he raped me, and it went back and forth."

The State argues that Bellino's questions to Valerie did not destroy the spontaneity of the statements. In support, the State cites *People v. Damen* (1963), 28 Ill. 2d 464. In *Damen*, the court held that simply because a police officer asked the victim "what happened" would not destroy the spontaneity of the victim's statements. (*Damen*, 28 Ill. 2d at 472.) Thus, the fact that the statement was made in response to a question does not automatically negate the statement's spontaneity, but instead is a factor to be considered. *People v. Hat-*

*field* (1987), 161 Ill. App. 3d 401, 409; *People v. Jarvis* (1987), 158 Ill. App. 3d 415, 422.

A review of the testimony in the case at bar leads us to the conclusion that the statements were not spontaneous declarations. Valerie repeated her account of the alleged sexual assault to her fiance several times after a series of questions. Thus, unlike the single question asked in *Damen*, this case involves a series of questions with repeated detailed answers concerning the alleged crime. While it was proper for Bellino to testify that he asked Valerie "who did it," which was similar to the "what happened" in *Damen*, it was improper to allow Bellino to testify to the repetitive statements that defendant raped her. It is our opinion that the detailed repetition of answers to the successive questions asked removed the spontaneity and immediacy required for spontaneous declarations. See *In re C.K.M.* (1985), 135 Ill. App. 3d 145, 149 (complaint must be spontaneous and not made as a result of a series of questions and answers); *People v. Davis* (1984), 130 Ill. App. 3d 41, 56 (repetitious statements made in response to questioning not spontaneous declarations); *People v. Witte* (1983), 115 Ill. App. 3d 20, 28 (victim's complaint admissible as spontaneous declaration because it was not a recital of an event "elicited from questions propounded to her").

Furthermore, we do not believe that Valerie's statements given to Officer Soulier qualify as spontaneous declarations. These statements were given after a lengthy conversation with her fiance, and after the police officer questioned her concerning the sexual assault. Thus, the previous discussion with her fiance destroyed the spontaneity of any statement given to the police officer. See *People v. Sephus* (1986), 150 Ill. App. 3d 272, 274-75 (statements by victim to mother not admissible as a spontaneous declaration because the victim discussed the incident with a family friend); see also *People v. Brown* (1988), 170 Ill. App. 3d 273, 282 (reversible error to admit police officer's testimony concerning victim's statement which extended beyond her initial complaint of sexual assault).

The State also contends that the testimony of Nurse Sronkowski and the stipulation of Dr. Alagappan were admissible as statements pertinent to medical diagnosis and treatment. While we agree with the State that the stipulation of Dr. Alagappan was proper, we disagree as to certain testimony of Nurse Sronkowski. While Nurse Sronkowski could properly testify to any statements made for medical diagnosis and treatment purposes, her testimony went beyond what was necessary to properly diagnose and treat Valerie at the hospital. Valerie identified the perpetrator as "a black man," a statement

which should have been excluded as descriptive testimony unnecessary for medical diagnosis and treatment.

The State further argues that even if the testimony concerning prior consistent statements was error, it was merely harmless error in view of the manifest evidence of defendant's guilt. We disagree. We regard the evidence in this case to be closely balanced. Given the conflicting nature of the testimony of the State's witnesses to that of defendant's witnesses in this case, matters of credibility become of vital importance. It is the function of the jury to resolve factual disputes and to assess the credibility of the witnesses. (*People v. Johnson* (1986), 149 Ill. App. 3d 128, 134.) The testimony of Valerie's fiance, Officer Soulier, and Nurse Sronkowski tended to make the jury perceive her testimony as more credible than that of defendant. In addition, the jury's reliance on the prior consistent statements was made more likely by the fact that the prosecutor, in his closing argument, alluded to the statements as corroborative evidence that she was telling the truth. (See *Russell*, 177 Ill. App. 3d at 49; *People v. Smith* (1985), 139 Ill. App. 3d 21, 34.) The improper bolstering of Valerie's testimony so prejudiced defendant before the jury as to deprive him of his right to a fair trial.

Accordingly, we hold that defendant's conviction here must be reversed and the case remanded for a new trial in view of the improper admission of the prior consistent statements at trial. In addition, pursuant to *People v. Taylor* (1979), 76 Ill. 2d 289, we have reviewed the sufficiency of the evidence at trial and believe that a retrial will not subject defendant to double jeopardy. (*Taylor*, 76 Ill. 2d at 309.) This determination in no way expresses an opinion as to defendant's guilt or innocence which would be binding on retrial.

On retrial, the State may elicit testimony to show that Valerie made a prompt complaint to her fiance and the police officer concerning the sexual assault. However, the identity of the perpetrator, along with the details of the assault, is hearsay testimony which does not come within the purview of the prompt complaint exception and is thus inadmissible. Furthermore, Valerie's response to Bellino's question "[W]ho did it?" is admissible under the spontaneous declaration exception. The testimony of Nurse Sronkowski should be limited to only those statements which were necessary to properly diagnose and treat Valerie at the hospital.

## JURY INSTRUCTIONS

■■ Defendant also contends that he was denied a fair trial where the jury instructions omitted the requisite mental state of the

offense charged. We will address this issue due to the possibility that it may arise again on retrial. Defendant contends that the offense of aggravated criminal sexual assault incorporates a mental state requirement in its statutory definition. However, we have recently addressed, and rejected, defendant's argument in *People v. Leonard* (1988), 171 Ill. App. 3d 380, *cert. denied* (1989), 490 U.S. 1008, 104 L. Ed. 2d 162, 109 S. Ct. 1647. In *Leonard*, we held that aggravated criminal sexual assault is a general intent crime which does not have a particular mental state as an essential element. (*Leonard*, 171 Ill. App. 3d at 385.) Moreover, in *People v. Ortiz* (1987), 155 Ill. App. 3d 786, this court determined that an offense involving sexual penetration is a general-intent crime, and a mental state of intent, knowledge, or recklessness would be implied to satisfy the general intent requirement. (*Ortiz*, 155 Ill. App. 3d at 792.) As such, it is our opinion that the jury was properly instructed as to the elements of the offense charged. We also decline defendant's invitation to overturn the *Leonard* and *Ortiz* decisions.

## SENTENCING

Defendant also raises two issues concerning alleged errors at his sentencing hearing. Defendant contends that: (1) the trial court improperly considered factors in aggravation at his sentencing hearing; and (2) he is entitled to credit for time served while in jail on an unrelated charge. However, we need not address defendant's contentions concerning his sentence in light of our decision reversing defendant's conviction and remanding for a new trial.

For the above stated reasons, the judgment of the circuit court of Kane County is reversed, and this cause is remanded for a new trial.

Reversed and remanded.

DUNN and McLAREN, JJ., concur.