THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KERRY L. POPE, Defendant-Appellant.

Fourth District    No. 4—95—0021

Opinion filed November 15, 1996.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Barney S. Bier, State's Attorney, of Quincy (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

A jury found defendant, Kerry L. Pope, guilty of one count of aggravated criminal sexual assault (720 ILCS 5/12—14(a)(2) (West 1992)) and one count of aggravated battery of a child (720 ILCS 5/12—4.3(a) (West 1992)), for which he was sentenced to consecutive terms of 60 years' and 30 years' imprisonment, respectively.

Defendant appeals, arguing that (1) the trial court erred by admitting deoxyribonucleic acid (DNA) evidence because the polymerase chain reaction (PCR) amplification-based procedures for DNA identification are not generally accepted in the scientific community; and (2) the prosecutor's improper closing argument deprived him of a fair trial. We affirm.

## I. BACKGROUND

Prior to trial in August 1994, defendant sought a continuance to

conduct a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) to determine the admissibility of DNA test results based on PCR analysis. Because the Illinois appellate courts had not ruled on the admissibility of such evidence, the trial court granted the motion. Before reviewing the evidence presented at the *Frye* hearing, we provide background information on both DNA structure and PCR analysis.

## A. DNA Structure and Identification

The following background information is taken from Thomas M. Fleming, Annotation, *Admissibility of DNA Identification Evidence*, 84 A.L.R.4th 313 (1991), unless otherwise noted. The DNA molecule is a long, threadlike structure resembling a twisted ladder packed into the chromosomes in every nucleated cell. Each side of the ladder is composed of a chain of sugars and phosphates, while the rungs attached to them consist of pairs of molecules called bases. While most sections of this chain of bases are largely the same among humans, certain sections are variable. Thus, a gene—the sequence of bases responsible for producing a particular protein—may be polymorphic, having two or more possible variations called alleles. Because of polymorphisms in human genetic structure, no two individuals (except for identical twins) have identical base sequences throughout their DNA.

The PCR amplification method of DNA identification, first devised in 1985, is one of two kinds of DNA tests most commonly used for identification. The other method is restriction fragment length polymorphism (RFLP) analysis, which our supreme court recently held to be generally accepted in the relevant scientific community. *People v. Miller*, 173 Ill. 2d 167, 188, 670 N.E.2d 721, 731 (1996). By 1990, the PCR method was one of the most widely used techniques in medical and biological research. *People v. Lee*, 212 Mich. App. 228, 264, 537 N.W.2d 233, 250 (1995). PCR-based techniques allow testing of DNA samples that have degraded as well as samples that are very small, such as a single strand of hair.

In the PCR-based DQ-Alpha procedure, an analyst looks at one particular gene, the DQ-Alpha gene, which is genetically inherited and appears in varying forms in different people. *Lee*, 212 Mich. App. at 264-65, 537 N.W.2d at 250. Six readily detectable alleles are present in the DQ-Alpha locus, and they are identified with the following numbers: 1.1, 1.2, 1.3, 2, 3, and 4. These alleles are combined in pairs in each individual, and the six combinations result in 21 possible "genotypes," each of which appears in varying proportions within the population.

In the PCR DQ-Alpha procedure, DNA is extracted from a sample, purified, and added to a buffer solution containing chemical primers (small pieces of DNA that recognize the four bases) and an enzyme called "TAQ polymerase." The solution is then modified (denatured) by being placed in a thermal cycler which cycles it through several successive temperature plateaus. During each cycle, the primer targets a specific gene and will bind to the genetically complementary portion of the DNA; further, TAQ polymerase works to copy the targeted gene. After 30 to 40 cycles, the DNA strand containing the targeted gene has been amplified billions of times.

The amplified DNA is then flooded over a nylon membrane onto which have been dotted a number of "allele-specific" probes, each of which is designed to recognize one sequence of the targeted gene. This may result in a color reaction and a visible dot on the membrane wherever a probe has identified one of the alleles. A blue dot is a match; a blank is a nonmatch. The amplified DNA may then be typed for the various DQ-Alpha genotypes. This process is referred to as the reverse dot blot hybridization or the blue-dot procedure.

If the DQ-Alpha genotype of a suspect is different from that of the evidence sample, the suspect is excluded as a source of the evidence. If the suspect and the evidence sample have the same genotype, then the suspect is included as a possible source. The probability that some other, unrelated individual would also match the evidence sample is equal to the frequency of the genotype in the relevant population.

## B. The *Frye* Hearing

At the *Frye* hearing, the trial court determined that Dr. Jenifer Ann Lindsey, a Federal Bureau of Investigation (FBI) special agent and a forensic serologist assigned to the DNA analysis unit, could testify as an expert in forensic serology and DNA analysis. Dr. Lindsey explained that the FBI uses two techniques based on PCR analysis—namely, DQ-Alpha typing and polymarker typing. The FBI has been using the DQ-Alpha typing technique since 1992 and the polymarker typing technique since August 1994 (after examining the polymarker technique "for well over a year" through validation and case studies).

Dr. Lindsey testified in detail regarding the PCR DQ-Alpha typing procedure. She specifically noted that FBI analysts perform 32 cycles in the thermal cycler to replicate the targeted gene. Dr. Lindsey also testified regarding the PCR-based polymarker typing procedure. She stated that in polymarker typing, an analyst simultaneously amplifies the DQ-Alpha gene as well as five additional gene

regions. Dr. Lindsey also explained the FBI's quality control measures (designed to prevent contamination) and control amplification procedures.

Dr. Lindsey stated that she completed 50 case studies comparing polymarker typing results and RFLP results and found that in all 50 cases the ability to discriminate between two different people was the same for the polymarker and the RFLP procedures. The case studies revealed that some people who were excluded as sources by RFLP testing were included as possible sources by DQ-Alpha typing. DQ-Alpha typing and polymarker typing together provide a power of discrimination (the ability to differentiate between individuals based on the DNA test results) of over 99%. Dr. Lindsey stated that DQ-Alpha typing is being used by many private laboratories, and polymarker typing was first put on the market in January 1994. She also opined that both DQ-Alpha typing and polymarker typing are generally accepted in the scientific community.

Dr. Lindsey further testified regarding the FBI's method of calculating the statistical probability of a random match. By using the product rule, the FBI estimates the statistical probability of a random match between the DNA sample taken from the crime scene and the defendant's DNA sample. In making this estimate, the FBI compares the DNA samples to a previously constructed population database. Because the PCR polymarker systems are two allele or three allele, the FBI may rely on a smaller database. Thus, the PCR Caucasian database contains only 145 individuals. For the polymarker typing procedure, the FBI multiplies the various alleles' frequency rates times each other to determine the statistical probability of a random match.

Regarding DQ-Alpha typing, Dr. Lindsey stated that the FBI tested 500 individuals from four different population groups ("Caucasian," "Black," "Southwestern Hispanic," "Southeastern Hispanic") and determined their DQ-Alpha genotypes. The FBI then added a database developed by Cetus Corporation (containing 237 individuals) because it was statistically similar to the FBI database. Dr. Lindsey stated that to determine the frequency of a particular DQ-Alpha genotype, the FBI uses the actual count method. For example, if an individual had a DQ-Alpha genotype of 2,2, an analyst would look to the database to determine how often that particular genotype occurred within the "Caucasian" population group (.020), then multiply by 100, and conclude that about 2% of the time in the Caucasian race one would expect to find an individual with a 2,2 DQ-Alpha genotype.

After hearing evidence and arguments from both parties, the

trial court found that the PCR-based methods of DNA identification (DQ-Alpha and polymarker) are "generally accepted as reliable." Accordingly, the court held that the DNA results from both DQ-Alpha typing and polymarker typing and the FBI's method of calculating the statistical probability of a random match were admissible at trial.

## C. Defendant's Trial

Given the arguments defendant raises on appeal, we discuss only the evidence particularly relevant to a consideration of his claims.

B.H.'s stepfather, Chris McColez, testified that on May 13, 1994, he, his wife (Retha), six-year-old B.H., and Retha's baby went to visit Retha's aunt. After B.H.'s eight-year-old cousin, Mandy Snyder, and B.H. had been playing outside for a while, Mandy and a neighbor came inside, and Mandy told McColez a man had tried to grab her and that B.H. was missing. McColez then went outside to look for B.H., crossed the nearby highway, and saw B.H. lying on the ground. She had no pants on, and defendant stood over her, "fidgeting" with his pants. Defendant swung a knife and stick at McColez and yelled for him to back off or defendant would kill him. McColez then fell, and defendant ran away. McColez testified that defendant was wearing a camouflage jacket, long pants, and had a beard and a mustache. Mandy testified that defendant was the man who tried to lure her into a park shortly before McColez found B.H.

James Saxberry, one of defendant's county jail cell-mates, testified that he asked defendant why he had assaulted B.H. According to Saxberry, defendant became tearful and said he did not know why he did it. Defendant told Saxberry that he picked up B.H., took her to the culvert, hit her, and placed his finger in her vagina and mouth and his penis in B.H.'s mouth. On cross-examination, Saxberry admitted felony convictions for deceptive practices and forgery. He also stated he was testifying as a condition of the sentence he received after pleading guilty to misdemeanor deceptive practices.

Dr. Maureen Swisher testified that she examined B.H. and found bruising and redness around B.H.'s head and neck. She also opined that an injury to B.H.'s vaginal area was consistent with a finger being pushed into the hymen area.

Quincy police officer Neal Meyer testified that he arrested defendant, who was wearing cutoff blue jeans which appeared to have been cut off recently. Inside the pickup truck in which defendant was sitting at the time of his arrest, Meyer found a camouflage shirt and knife. The cutoff portions of blue jeans that were recovered from the area near where defendant was found sleeping in his pickup truck

showed bloodstains, which were analyzed. Salvia samples were also recovered from the culvert where B.H. was found.

Dr. Lindsey testified that the PCR-based test results in this case indicated that defendant is a potential source of the saliva samples taken from the culvert, while B.H. was not. The likelihood that another individual could have been the source of the saliva samples is 1 out of 2 million in the "Black" population, 1 out of 4,100 in the "Caucasian" population, 1 out of 6,000 in the "Southeastern Hispanics" population, and 1 out of 2,300 in the "Southwestern Hispanics" population. (Defendant is Caucasian.) Dr. Lindsey also stated that B.H. is a potential source of bloodstains found on the cutoff portion of defendant's jeans, while defendant was not. The likelihood that another individual could have been the source of the bloodstains was 1 in 24,000 in the "Black" population, 1 out of 1,600 in the "Caucasian" population, 1 out of 2,300 in "Southeastern Hispanics" population, and 1 out of 2,300 in "Southwestern Hispanics" population.

Defendant testified and denied committing the crimes. Defendant stated that he drank several beers after work on May 13, 1994, and sometime after 7 p.m., he walked to the culvert to urinate. Once there he saw B.H. lying on the ground with her pants and underwear around her ankles. When he leaned down to help B.H. and pick her up, her hair became entangled in his jacket button. As defendant pulled her hair away from the button, McColez "jumped" into the culvert. Defendant stated that he pulled out a knife because McColez frightened him. Defendant acknowledged that he hid his camouflage jacket, took off his shirt, and cut off his jeans with a knife to change his appearance. Defendant also admitted that he initially lied to the police regarding whether he cut off his jeans. Defendant denied ever talking to Saxberry.

## II. ANALYSIS

### A. Admissibility of the DNA Identification Evidence Based on the PCR Method

Defendant first argues that DNA evidence based on the PCR method of DNA identification is inadmissible because DQ-Alpha typing and polymarker typing are not generally accepted in the scientific community. We disagree.

■ Illinois follows the *Frye* standard for the admission of novel scientific evidence. *Miller*, 173 Ill. 2d at 187, 670 N.E.2d at 731. The *Frye* court explained the standard as follows:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the

principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014.

General acceptance in the scientific community does not require scientific unanimity. *People v. Dalcollo*, 282 Ill. App. 3d 944, 957, 669 N.E.2d 378, 387 (1996). Further, the mere fact that a dispute exists will not preclude a trial court from finding that a procedure is generally accepted. *Dalcollo*, 282 Ill. App. 3d at 957, 669 N.E.2d at 387. The determination whether the State has met the *Frye* standard lies within the trial court's discretion, and a reviewing court will not reverse absent an abuse of that discretion. *People v. Lipscomb*, 215 Ill. App. 3d 413, 430, 574 N.E.2d 1345, 1356 (1991); see also *Miller*, 173 Ill. 2d at 187, 670 N.E.2d at 731.

Initially, we note that the majority of defendant's contentions concern proper laboratory protocol and preventing contamination of DNA samples. Relying in large part on a 1992 report from the Committee on DNA Technology in Forensic Science (Committee), under the auspices of the National Academy of Sciences (National Research Council, DNA Technology in Forensic Science (1992)) (hereinafter NRC Report), defendant contends PCR analysis involves the following "technical problems": (1) thermal cyclers can give varying results unless their performance is rigorously characterized for variation sensitivity; (2) amplification with "current" PCR technique may not be completed with sufficient "quantitative and qualitative fidelity"; (3) "[s]ome forensic samples contain factors that inhibit amplification"; and (4) evidence samples may be contaminated with other human DNA. However, the *mere potential* for contamination or differential amplification does *not* render the PCR-based techniques generally unaccepted by the scientific community. See *State v. Russell*, 125 Wash. 2d 24, 51, 882 P.2d 747, 767-68 (1994). Rather, such concerns bear on the question of whether a laboratory or analyst has complied with generally accepted standards in a given case. As this court most recently noted in *People v. Johnson*, 262 Ill. App. 3d 565, 569, 634 N.E.2d 1285, 1288 (1994), quoting *Lipscomb*, 215 Ill. App. 3d at 432, 574 N.E.2d at 1357, " '[a]ny question *concerning the specific procedures* used by the company or expert goes to the reliability of the evidence and is properly considered *by the jury* in determining what weight to give to this evidence.' " (Emphasis added.) In addition, the NRC Report itself acknowledges the admissibility of DNA evidence (without distinguishing between PCR and RFLP methodology), as long as precautions suggested in the report are taken:

"As a general matter, so long as the safeguards we discuss in this report are followed, admissibility of DNA typing should be encouraged. There is no substantial dispute about the underlying scientific principles. However, the adequacy of laboratory procedures and of the competence of the experts who testify should remain open to inquiry." NRC Report at 146.

In the present case, Dr. Lindsey, the sole witness at the *Frye* hearing, testified in detail regarding PCR-based techniques for DNA identification, including DQ-Alpha typing and polymarker typing. She explained that PCR analysis had been used for several years in research and diagnostic labs, and she had conducted and supervised validation and case studies prior to using PCR analysis for forensic purposes. In a study of 50 cases, Dr. Lindsey found that polymarker typing resulted in the *same* individuals being excluded as with RFLP testing. She also stated that while DQ-Alpha typing has a lower power of discrimination than RFLP, DQ-Alpha typing and polymarker typing together provide a power of discrimination of over 99%. She also stated that the FBI has instituted quality control measures to prevent contamination and control amplification procedures. Dr. Lindsey acknowledged that TAQ polymerase may potentially create amplification errors; however, the potential for such error was low. Further, she stated that any copying error would be insignificant due to the number of times the targeted gene is replicated. She also stated that since the NRC Report was issued, two Committee members, Dr. Kaia Kazazian and Dr. George Sensabaugh, have expressed the view—either through affidavit or testimony—that PCR-based techniques, including DQ-Alpha typing, are generally accepted as reliable in the relevant scientific community.

■ Upon the record before us, we conclude the trial court did not abuse its discretion by finding that the PCR-based procedures for DNA identification—namely, DQ-Alpha typing and polymarker typing—are "scientifically reliable and generally accepted" and admissible. Accordingly, we hold that PCR-based methods of DQ-Alpha typing and polymarker typing for DNA identification are now generally accepted in the relevant scientific communities involved, and trial courts need not conduct future *Frye* hearings on this issue.

In so holding, we specifically disagree with defendant's contention that copying errors caused by the enzyme TAQ polymerase destroy the general acceptance of PCR-based techniques. Instead, we agree with the Michigan Appellate Court in *Lee* (212 Mich. App. at 277, 537 N.W.2d at 255), that any errors which may be caused by TAQ polymerase are not serious enough to undermine the general acceptance of PCR-based techniques for DNA identification as reliable.

We also note that several other courts have held that PCR-based DNA test results are admissible. In *Russell* (125 Wash. 2d at 54 & n.7, 882 P.2d at 768 & n.7), the Supreme Court of Washington addressed this issue and held that this technique has been generally accepted by the scientific community. In *Lee* (212 Mich. App. at 280-81, 537 N.W.2d at 257), the court also held that PCR-based DQ-Alpha typing is generally accepted as reliable under a version of the *Frye* standard. See also *State v. Hill*, 257 Kan. 774, 781-86, 895 P.2d 1238, 1244-47 (1995); *State v. Williams*, 252 N.J. 369, 599 A.2d 960 (1991). Other states have also admitted PCR test results, but under standards other than *Frye*. See *Harmon v. State*, 908 P.2d 434, 440-41 (Alaska App. 1995); *State v. Moore*, 268 Mont. 20, 48, 885 P.2d 457, 475 (1994); *State v. Lyons*, 124 Or. App. 598, 602-10, 863 P.2d 1303, 1306-11 (1993); *State v. Moeller*, 548 N.W.2d 465, 479-83 (S.D. 60 1996); *Clarke v. State*, 813 S.W.2d 654, 655 (Tex. Ct. App. 1991); *Spencer v. Commonwealth*, 240 Va. 78, 97-98, 393 S.E.2d 609, 621 (1990).

We also find support for our holding in the extensive validation studies which have been conducted on PCR-based analysis for DNA identification. As Dr. Lindsey testified, the FBI conducted validation and case studies to determine the reliability of DQ-Alpha typing and polymarker typing prior to using them for forensic purposes. Further, the *Russell* court noted that Cetus Corporation (distributor of the DQ-Alpha test kit) had produced a bibliography listing over 1,000 articles on PCR analysis. *Russell*, 125 Wash. 2d at 50, 882 P.2d at 766; see also N. Dimo-Simonin & C. Brandt-Casadevall, *Evaluation and Usefulness of Reverse Dot Blot DNA-PolyMarker Typing in Forensic Case Work*, 81 Forensic Sci. Int'l 61 (1996); C. Comey & B. Budowle, *Validation Studies on the Analysis of the HLA DQ Alpha Locus Using the Polymerase Chain Reaction*, 36 J. Forensic Sci. 1633 (1991).

B. Calculation of the Statistical Probability of a Random Match
■ Defendant next argues that the trial court erred by admitting this evidence because the FBI's method of calculating the statistical probability of a random match, by use of the product rule, is not generally accepted in the scientific community. We disagree.

In *People v. Miles*, 217 Ill. App. 3d 393, 405, 577 N.E.2d 477, 485 (1991), this court discussed a defendant's challenge to the admission of probability statistics:

"This court [in *Lipscomb*] *** [held that] the [RFLP] DNA identification procedure was admissible, including 'the development of frequencies, and procedure whereby the individual frequencies are multiplied together to determine the ultimate frequency of the pattern.' (*Lipscomb* (1991), 215 Ill. App. 3d at

432[, 574 N.E.2d at 1357].) Implicitly, the [*Lipscomb*] court held the process of generating probability statistics is an integral part of the DNA identification process. Because the DNA identification process meets the *Frye* test and is admissible, probability statistics operated thereby are admissible."

Therefore, because we have concluded that the PCR-based techniques of DQ-Alpha typing and polymarker typing for DNA identification are admissible under the *Frye* standard, we also conclude the FBI's method of calculating the statistical probability of a random match, including its use of a smaller database in polymarker typing, is admissible. Thus, we hold that the trial court did not err by admitting the FBI's statistical probability evidence.

We also note that the Supreme Court of Illinois in *Miller* recently wrote that "while there has been some controversy over the use of the product rule in calculating the frequency of a DNA match, that controversy appears to be dissipating." *Miller*, 173 Ill. 2d at 188-89, 670 N.E.2d at 731-32. In addition, the Second District Appellate Court in *Dalcollo* recently provided a detailed discussion of the FBI's method of calculating the statistical probability of a random match as derived by the product rule. That court concluded that recent developments "clearly debunk the notion that a 'bitter debate'—if ever there was one—is still raging in the scientific community," and held that the FBI's method is generally accepted in the scientific community. *Dalcollo*, 282 Ill. App. 3d at 960, 669 N.E.2d at 388.

## C. The Prosecutor's Closing Argument

■ Defendant argues that the prosecutor made several improper remarks during closing argument that deprived him of a fair trial. In evaluating this argument, we keep in mind that a prosecutor "is given great leeway in closing argument" (*People v. Simms*, 168 Ill. 2d 176, 197, 659 N.E.2d 922, 933 (1995)) and that, while "there are limits to proper argument, *** forcefully arguing that the State has proven its case is not, in itself, improper" (*Simms*, 168 Ill. 2d at 196-97, 659 N.E.2d at 933). Further, remarks made in closing will not merit reversal unless they result in substantial prejudice to the defendant. *People v. Peeples*, 155 Ill. 2d 422, 482, 616 N.E.2d 294, 322 (1993).

■ First, defendant contends that the prosecutor expressed his personal beliefs regarding witnesses' credibility and invoked the integrity of the State's Attorney's office when he made the following comments:

> "Now, the [d]efendant's story is, and ladies and gentlemen, I would submit that it is an insult to your intelligence. His story is that he is a trained CPR man. *** I came upon this scene and immediately went to help, except that I didn't know what to do, and I forgot everything ***.

* * *

Now, Jim Saxberry testified. And, isn't it interesting. Of course, his credibility is challenged. He has got felony convictions. We gave him a deal. There is no question about that. I'd trade a bad check writer for a baby molester any day. Isn't it interesting that his testimony as to what [d]efendant told him just happens to exactly fit with the evidence, with the physical evidence \*\*\*."

Because defendant failed to object, he has waived this issue unless the prosecutor's remarks constitute plain error. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988); *People v. Turner*, 241 Ill. App. 3d 236, 242, 608 N.E.2d 906, 911 (1993). Not only do we conclude there is no plain error, we hold that the prosecutor's comments were not error at all.

It is improper for a prosecutor to personally vouch for a witness' credibility or express a personal opinion. *People v. Emerson*, 122 Ill. 2d 411, 434, 522 N.E.2d 1109, 1118 (1987). However, a prosecutor may comment on a witness' credibility (*People v. Richardson*, 123 Ill. 2d 322, 356, 528 N.E.2d 612, 625 (1988)), and challenge a defendant's credibility and defense theory when such remarks are based on facts in evidence or reasonable inferences drawn therefrom. *People v. Hudson*, 157 Ill. 2d 401, 444, 626 N.E.2d 161, 179 (1993).

In *Emerson*, 122 Ill. 2d at 434-35, 522 N.E.2d at 1118, a defendant argued that the prosecutor improperly vouched for a witness' credibility by making the following comments:

" 'And we know Robert Ray was telling you the truth. We could tell. \*\*\*'

* * *

'\*\*\* We know Robert Ray was telling you the truth about what happened because we heard another witness in this case. A witness that this cold evil man who sits over there brought to the witness stand.' " (Emphasis omitted.)

The supreme court rejected the argument that the prosecutor improperly expressed his personal opinion, concluding these remarks constituted fair comment on the evidence. *Emerson*, 122 Ill. 2d at 435, 522 N.E.2d at 1118. Further, in *People v. Baker*, 195 Ill. App. 3d 785, 787, 552 N.E.2d 421, 423 (1990), defendant argued the prosecutor improperly expressed his personal opinion when he made the following remarks:

"If ever there was a situation where a person was detained, I think it was demonstrated by the testimony \*\*\*. \*\*\* I think it could be reasonably inferred from the evidence[.]"

This court in *Baker* rejected defendant's argument and concluded that "[w]hile it might be good practice for prosecutors to refrain in

argument from using sentences beginning with, 'I believe' or 'I think,' we reject defendant's argument that any time a prosecutor does so error results." *Baker*, 195 Ill. App. 3d at 788, 552 N.E.2d at 423.

Consistent with these decisions, we expressly reject the notion that a prosecutor improperly crosses the bounds of asserting his personal views regarding witnesses' credibility or defendant's theory of the case if the jury has to *infer* the prosecutor is doing so from his comments. Thus, we hold that for a prosecutor's closing argument to be improper, he must *explicitly* state that he is asserting his personal views, stating for example, "this is my personal view."

In this case, the prosecutor's remarks were such that the jury would have to infer that he was giving his personal opinion regarding the defense theory or personally vouching for Saxberry's credibility. Accordingly, we conclude that the prosecutor's remarks were not improper. We also reject defendant's contention the prosecutor's comment invoked the integrity of the State's Attorney's office.

■ Last, defendant claims that the prosecutor improperly argued that the State's witnesses were "heroes" for testifying where there was no evidence to support this characterization. Again, because defendant failed to object to the argument when made, he has waived the issue unless it constitutes plain error. *Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1130; *Turner*, 241 Ill. App. 3d at 242, 608 N.E.2d at 911. However, these remarks constitute no error at all. At worst, they are a hyperbolic expression of the gratitude the community should feel toward witnesses whose involvement in the case may have saved this young victim from further harm at the hands of this vicious criminal.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

COOK, P.J., and GREEN, J., concur.