THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES TRENT, Defendant-Appellant.

Third District    No. 3—97—0977

Opinion filed February 25, 2000.—Rehearing denied September 1, 2000.

Donna K. Kelly (argued), of State Appellate Defender's Office, of Ottawa, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (John X. Breslin and Rita

440

Kennedy Mertel (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KOEHLER delivered the opinion of the court:

The defendant-appellant, James Trent, appeals his conviction in the Peoria County circuit court of first degree murder and aggravated battery of a child and the imposition of a sentence of natural life imprisonment without parole. This court must answer the following questions: (1) Did the defense counsel employ a strategy that constituted no defense and concede Trent's guilt in closing argument, thereby denying Trent his right to effective assistance of counsel? (2) Did the circuit court abuse its discretion when it allowed (i) the State to display photographs of the victim during its opening statement; (ii) the State to display selected slides of the victim during expert testimony; (iii) the State to display a life-size photograph of the victim during trial; (iv) experts to testify regarding the severity of the victim's beating; (v) the State to explain in opening argument that it believed the codefendant was less culpable than the defendant; and (vi) a police officer to testify to the codefendant's out-of-court statement to him that she feared the defendant? (3) Does Public Act 89—203, effective July 21, 1995, under which the defendant was sentenced, violate the Illinois Constitution's single subject rule? and (4) Does the mandatory life sentence provision violate the Illinois Constitution's requirement that, when sentencing, the court must consider the defendant's potential for restoration to useful citizenship? We conclude that (1) the defendant was not denied effective assistance of counsel when the defense counsel employed the strategy available under the circumstances; and (2) the circuit court either did not abuse its discretion in its evidentiary rulings or such abuse did not substantially prejudice the defendant and, therefore, does not require reversal. Accordingly, we affirm the defendant's conviction, but we remand this cause to the circuit court for resentencing because our supreme court has recently concluded that Public Act 89—203 violates the single subject rule.

## FACTS

James Trent was indicted for first degree murder and aggravated battery of a child in the death of four-year-old Christian Nickels on July 20, 1996. A jury convicted Trent of causing Christian's death by repeatedly striking her about her body with a belt, metal pole and metal spatula, without legal justification and knowing such act created a strong probability of great bodily harm or death. See 720 ILCS 5/12—4.3 (a) (West 1996). They also convicted him of being more than 18 years of age and of knowingly and without legal justification causing great bodily harm to a child under 13 years of age, by repeatedly strik-

ing Christian with a belt, a metal pole and a metal spatula. See 720 ILCS 5/9—1(a)(2) (West 1996). The circuit court sentenced Trent to life in prison. The crime occurred in Peoria; however, the defense successfully moved for a change of venue and the trial took place in Du Page County.

On July 20, 1996, the Peoria fire department responded to a 911 call of a child not breathing. When the firemen arrived, they found Trent on the telephone and standing over Christian, who was not breathing. St. Francis Hospital's Dr. Robert Tillotson could not revive Christian, and he pronounced her dead at approximately 3:50 p.m. in the emergency room. Dr. Tillotson testified that he had never seen a child so badly beaten.

Peoria police officer Pat Rabe testified that Trent told him that he arrived home at approximately 1 p.m. on July 20. Trent stated that Katrina Hardin, Christian's mother, told him that Christian had been misbehaving and he and Hardin spanked Christian. Rabe testified that Trent asked him about Christian's condition and if he believed in corporal punishment. Trent told Rabe he had been raised to believe that children should be punished when they misbehave.

Peoria police officer Willie King testified that Trent told him that evening that Hardin told him that Christian had been misbehaving and he spanked her with his belt. Trent told King that he instructed Christian to lie on the bed for five "licks," but she moved after four and he continued to spank her for 10 minutes. Trent then removed his two-year-old daughter, of whom he had custody, from the room and continued spanking Christian until he "gave up." Hardin then began beating Christian with a metal spatula and asked Trent to hold Christian's legs while she beat her. He did so. After Hardin stopped, Trent hit Christian with the spatula 10 or 12 times and then struck her more than once with a metal pole. Christian jumped off the bed and, according to Trent, Hardin grabbed the pole from him and struck Christian with it. She punched Christian, knocking out her teeth, and then struck her again with the pole. Trent said that he tried to stop Hardin, but she struck him with the pole, causing a three-inch scrape on his right bicep. Thereafter, Hardin gave Christian a bath and Trent stated he saw Hardin hold Christian's head under the water. Trent told King that he then sat Christian on his lap and explained that they had spanked because she would not "lay still and take her punishment." Hardin later put Christian in bed and, after Trent noticed Christian did not seem to be breathing, Hardin gave her another bath. Trent also told King that he did not know how many times he struck Christian. In response to the prosecutor's questioning, King testified that the police allowed Hardin and Trent to speak in private at the

station, but he monitored them because Hardin had "expressed concerns for her safety."

At trial, Trent testified that he arrived home on July 20 and Hardin told him that Christian had been misbehaving. Trent spanked her with his belt on her buttocks. When she would not stop jumping around and do as she was told, Hardin hit her with the spatula. Trent took the spatula from Hardin and also struck Christian with it. He stated that he grabbed the metal pole to use as a "fear factor" because it had previously caused her to behave. He stated that he hit her with it twice but did not hit her with great force. When he stopped, Hardin again began hitting Christian with the pole. Trent said Hardin went wild and he saw her hit Christian on her arm with the pole. He also saw Hardin punch Christian with her fists, and he saw Christian hand Hardin her tooth. He tried to make Hardin stop, but she was swinging so wildly she hit him with the pole. Trent finally took the pole from Hardin, and she stopped punching Christian. After the beating stopped, Hardin bathed Christian. Trent stated he heard Hardin say "stop faking." He saw Hardin "slam" Christian down in the tub, and he told Hardin to stop. Trent then sat her on his lap to tell her why he spanked her, and he gave her a popsicle. Later, he noticed Christian was not moving. He administered CPR and then called 911. He testified that he thought she had drowned from the bath and he did not think the beating caused Christian's condition. He testified that he had been physically disciplined as a child and had been taught that corporal punishment was the correct way to discipline children. Trent testified that he is 6 feet 7 inches tall and weighed 250 pounds at the time of the beating. At the time of the trial, he weighed approximately 320 pounds.

Hardin was convicted of murder for Christian's death and agreed to testify against Trent in exchange for the State's agreement not to seek the death penalty against her. As Hardin testified, the trial court allowed the display of a 46-inch life-size photograph of a smiling Christian. Hardin testified that she was at home with Christian and Trent's two-year-old daughter and she spanked Christian and put her in a corner for using profanity. Trent arrived home at approximately 1 p.m., and she told him what Christian had done. Trent told Christian to "presume [sic] the position." He ordered Christian to undress and spanked her with his belt. Harden also hit Christian with the belt and then they both hit her with a metal pole, and Trent hit her with a spatula. Christian escaped from Trent more than once, at one point hiding behind a chair, but she returned to him when he so ordered. Christian was crying and saying, "Daddy, I'm going to do what you tell me to do." During the beating, Christian came into the kitchen

and handed Hardin her tooth. Hardin later gave Christian's tooth to the police. Hardin testified that, during the beating, Trent told Hardin to play the Tony Braxton compact disc, "You Making Me High." She testified that she never saw Trent hit Christian in the head. She stated that, while she gave Christian a bath, Trent cleaned up the main room where most of the beating occurred. Hardin said that after Christian lost consciousness, she called 911.

Peoria police detective Lisa Snow testified that Hardin told her that Christian had slipped on the bathtub and bumped her head. She also told her that Christian bumped her head while jumping on the bed. Later, at the police station, Hardin gave Snow one of Christian's teeth.

Dr. Violette Hnilica, a board-certified forensic pathologist, performed the autopsy on Christian. Identifying Christian's injuries in emergency room and autopsy slides during trial, Hnilica testified that, in her opinion, Christian died from possible blunt force injuries to her trunk, upper arms and thighs. According to Dr. Hnilica, Christian suffered deep bruising to the bone which crushed her tissues, releasing "intracellular components," including acid and potassium into her bloodstream. These eventually reached her heart and brain and caused them to shut down. According to Dr. Hnilica, there was no bleeding in Christian's eyes to indicate blunt force to the head, and she would have died even if she had not been struck in the head.

Dr. Robert Kirschner, also a board-certified pathologist, testified as a State witness. Based on his review of the photographs and autopsy report, he opined that Christian died of shock due to multiple blunt trauma. Dr. Kirschner testified that, although Christian had been hit in the head, those blows did not cause her death. He further testified that Christian's injuries were in the top 10% of the most severe injuries he had ever seen.

Dr. Travis Hindman, a forensic pathologist, testified for the defense. He also reviewed the photographs and autopsy report and testified that, in his opinion, Christian died of brain trauma due to a broad surface blunt impact to the head. He further testified that Christian had a 50% chance of surviving the other injuries.

The circuit court denied the defendant's motion for a directed verdict and his postsentencing motion for dismissal notwithstanding the verdict or for a new trial. The circuit court also denied the amended motion for a new sentence, in which the defendant asserted that the statute under which he was sentenced was unconstitutional. The defendant now appeals.

## ANALYSIS

### A. Ineffective Assistance of Counsel

Did the defense counsel's strategy together with his remarks in closing argument deprive Trent of his defense and of the effective assistance of counsel? The defendant, Trent, argues that his defense counsel (1) failed to understand the law of accountability; (2) conceded Trent's guilt of aggravated battery of a child during closing argument; and (3) conceded that Trent had the required mental state for murder; therefore, his counsel's performance deprived him of effective assistance of counsel. According to Trent, his strategy was based in part on his personal history of how his parents disciplined him as a child and his belief that he was correctly disciplining Christian. However, during closing argument, the defense counsel told the jury that the defendant's state of mind was not an excuse for aggravated battery of a child. Although knowledge is the requisite mental state for murder, the defense counsel incorrectly told the jury that the requisite mental state for murder is intent. Trent maintains his counsel conceded Trent's guilt in closing argument when he told the jury to "find him guilty of aggravated battery of a child." He maintains that by telling the jury this, he essentially instructed it to find Trent guilty of knowingly and without legal justification causing great bodily harm to Christian. He, therefore, conceded the requisite mental state for murder and all of the elements of murder except causation. Further, his defense counsel instructed the jury that "you can't find someone guilty of murder regardless of what theory you use if they weren't involved in those actions." Trent argues that his defense counsel's strategy was wrong, however, because the circuit court instructed the jury on the theory of accountability and, therefore, even if Trent had not inflicted the fatal blow, he could still be found guilty of murder. The defendant argues that instead of conceding defendant's guilt of aggravated battery, counsel should have argued that, based on Trent's upbringing and his beliefs regarding child discipline, Trent did not knowingly cause great bodily harm to Christian. Further, with respect to the murder charge, counsel should have argued that Trent did not know his acts created a strong probability of death or great bodily harm.

The State responds that the defense counsel employed the only strategy available, attempting to shift responsibility for Christian's death to Hardin. Moreover, the State maintains that a review of the entire closing argument does not indicate that Trent's counsel misunderstood the law of accountability or conceded Trent's guilt of first degree murder. Counsel argued that Trent attempted to stop Hardin from beating Christian about the head and attempted to minimize

Trent's involvement in the murder. He argued that the medical testimony did not establish that Christian died of multiple blunt trauma and presented evidence that she died of head injuries inflicted by Hardin. Further, the State maintains that Trent's counsel argued that the jurors should consider Trent's state of mind based on his experiences. The State contends that, even if the defense counsel was ineffective, Trent was not prejudiced by any of his errors. The evidence introduced at trial overwhelmingly established that Christian died from multiple blows to her body and Trent inflicted most of those blows. The State maintains that, even if Trent's counsel's trial performance fell below an objective standard of reasonableness, the result of the trial would not have been different.

■ In order to show ineffective assistance of counsel, the defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). The defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. However, the evaluation of the defense counsel's conduct does not extend to the exercise of judgment or discretion or to trial tactics. *People v. Mitchell*, 105 Ill. 2d 1, 12, 473 N.E.2d 1270, 1274 (1984). Further, "[a] court need not determine whether counsel's performance was deficient before examining the prejudice suffered if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. *** [I]neffective-assistance-of-counsel claims must be viewed under the totality of the circumstances of each individual case." *People v. Shatner*, 174 Ill. 2d 133, 144-47, 673 N.E.2d 258, 263-64 (1996).

■ The Illinois Criminal Code of 1961 provides:

"(a) Any person of the age of 18 years and upwards who intentionally or knowingly, and without legal justification and by any means, causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years *** commits the offense of aggravated battery of a child." 720 ILCS 5/12—4.3(a) (West 1996).

Further:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another ***."

720 ILCS 5/9—1(a) (West 1996).

A person is accountable for another's acts if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1996).

In *Shatner*, our supreme court rejected the defendant's contention that his counsel's statement to the jury that "if he's [defendant's] guilty of anything, he's guilty of robbery," compelled the jury to find him guilty of first degree murder and constituted ineffective assistance of counsel. *Shatner*, 174 Ill. 2d at 147, 673 N.E.2d at 264. The supreme court concluded that, although the defense counsel's strategy to convince the jury that his client's involvement in the crime did not warrant a murder conviction was "risky, it was strategy nonetheless, and perhaps the only strategy which could have been seriously pursued given defendant's admissible incriminating statements and the overwhelming evidence of his guilt." *Shatner*, 174 Ill. 2d at 148, 673 N.E.2d at 265.

In the case at bar, Trent's counsel argued in closing:

"[Y]ou have to find beyond a reasonable doubt that James Trent acted in concert with this woman to inflict those fatal blows.

And where are those fatal blows ***? You heard Dr. Hindman, you heard Dr. Hnilica, you heard Dr. Kirschner, *** and Dr. Hindman ***. *** I guess, *** what he says makes sense.—And he says, yes, there is a 50 percent or better chance that the injuries, save for the injuries up here, were survivable, and you can't find someone guilty of murder regardless of what theory you use if they weren't involved in those actions.

\* \* \*

*** [H]e told you, members of the jury, as he told Detective King, that, hey, he hit her with the spatula. He doesn't deny that. Hit her with the belt, and he talked about the number of times that Katrina did that, and it is ugly to look at.

\* \* \*

*** [T]o find James guilty of murder, you must find beyond a reasonable doubt that he performed acts which caused death, and that he knew his acts created a strong probability of death or great bodily harm."

The prosecutor objected that the defense counsel had misstated the law, and the defense counsel continued:

"You're right. *** He or one for who he is legally responsible knew that his acts created a strong probability of death or great bodily harm.

***[He] did strike Christian Nickels. He struck her in a particular area of the body, the buttocks. *** But its not those actions which caused the death of Christian. Imposing discipline is, as bizarre as that may sound to anyone in here, that is how he was raised. It's not a justification ***. You find him guilty of aggravated battery of a child. Go ahead and do that. But it's something you have to consider when you get to the issue of intent, which is an element that must be proven. It must be proven beyond a reasonable doubt."

Again, the prosecutor objected that the defense counsel misstated the law. The defense counsel responded:

"[K]nowingly is what the law and what the instruction is. Knowledge at what he was doing. [He] used physical discipline. He's told you that. He told the police that. It's his experience. It was the way he was thought to keep a child from remaining—off the streets. Follow the direction of adults.

And you cannot, as jurors, in following the law, regardless of how many theories the State may throw at you, find him guilty beyond a reasonable doubt based on his actions and his activities based on the evidence against him that the State presented during the course of this trial."

■ It is apparent that defense counsel's strategy sought to convince the jury that Christian died from blows inflicted by Hardin, which Trent tried to stop, and that, because of his upbringing, Trent believed he was disciplining Christian. The evidence against Trent, including his own statements, is overwhelming and we will not evaluate defense counsel's trial tactics. Therefore, defense counsel's performance was not deficient. Accordingly, we conclude that counsel's argument did not deny Trent effective assistance of counsel.

B. Evidentiary Rulings

Trent also argues that the circuit court abused its discretion in making the following evidentiary rulings: (1) allowing the State to display photographs of the victim during opening statement; (2) allowing certain slides of the victim to be displayed during expert testimony; (3) allowing the display of a life-size smiling photograph of the victim during Hardin's testimony; (4) allowing experts to testify regarding the severity of the victim's beating; (5) allowing the State to explain in its opening argument the reasons for Hardin's plea agreement; and (6) allowing Officer King to testify to Hardin's out-of-court statement that she feared Trent. Trent argues that he did not receive a fair trial because of the magnitude and fundamental nature of these errors, individually and cumulatively. Further, he maintains his counsel's performance fell below an objective standard of reasonableness and

deprived him of a fair trial. The State responds that (1) the defendant did not object to the State's opening remarks or raise these issues in his posttrial brief and therefore waived any alleged error; (2) the circuit court committed no error; (3) the judge cured any alleged error; and (4) defendant's trial counsel effectively represented his client. The State argues that the trial judge instructed the jury to disregard questions to which objections were sustained, thereby curing any alleged error relating to King's testimony.

### 1. Exhibition of Photographs During Opening Argument

■ Trent first argues that the circuit court abused its discretion when it allowed the State to display during opening arguments two 8-inch by 10-inch photographs of Christian on the hospital examination table. According to Trent, the photographs had not yet been admitted into evidence and showed the same thing and, therefore, were cumulative in nature. They prejudiced the defendant because they immediately impressed upon the jurors' minds the image of a four-year-old's naked corpse and served no purpose but to arouse the passions of the jury. The State responds that the exhibits were admitted into evidence later. Moreover, the photographs were not misused by the prosecutor but used briefly to describe Christian's appearance when she arrived at the hospital. Further, the prosecutor indicated before opening statement his intention to display the 8-inch by 10-inch photographs, the life-size photograph, a diagram of the apartment where the beating occurred, the metal rods and the spatula in his opening argument. The defendant objected only to the photographs, arguing that it would be improper to contrast the photos of Christian after her death with a photograph taken during her life, and the judge ruled the life-size photograph could not be used during the opening statement. The defendant did not object to the display of the photographs when they were introduced into evidence or published to the jury. Consequently, the photographs were properly displayed during opening argument.

When a party fails to object at trial, the issue is waived in the absence of plain error. *People v. Sommerville*, 193 Ill. App. 3d 161, 171, 549 N.E.2d 1315, 1322-23 (1990). "[P]lain error may be invoked in criminal cases where the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial." *Sommerville*, 193 Ill. App. 3d at 171, 549 N.E.2d at 1323. The exception is narrow and limited and "should not be applied in every case in which some error has occurred in the trial court." *Sommerville*, 193 Ill. App. 3d at 171, 549 N.E.2d at 1323. The admissibility of evidence at trial is within the sound discretion of the trial court, and the court's

decision will not be overturned on appeal absent a clear abuse of discretion. *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991). In opening statement, the parties discuss the evidence and inform the jury of what each believes the evidence will prove and the reasonable inferences to be drawn from the evidence. No statement may be made in opening statements that counsel does not intend to prove or cannot prove. *People v. Kliner*, 185 Ill. 2d 81, 127, 705 N.E.2d 850, 874 (1998). "Reversible error occurs only where the prosecutor's opening comments are attributable to deliberate misconduct of the prosecutor *and* result in substantial prejudice to the defendant." (Emphasis in original.) *Kliner*, 185 Ill. 2d at 127, 705 N.E.2d at 874. In the instant case, the defendant did not object to the prosecutor's use of the spatula, the metal poles or the diagram of the apartment but rather only the photographs of Christian. The 8-inch by 10-inch photographs were admitted into evidence during trial, and we do not perceive that the prosecutor misused the photographs in exhibiting them to show Christian's condition when she arrived at the hospital. Nor do we believe that they substantially prejudiced Trent. Moreover, the trial judge did not allow the display of the life-size photograph, which would have contrasted with the photographs of the dead child, during opening argument. Accordingly, we conclude that the circuit court did not abuse its discretion in allowing the 8-inch by 10-inch photographs to be displayed during opening statements.

## 2. Exhibition of Autopsy Slides

The defendant further contends that the prejudicial and inflammatory nature of selected autopsy slides used during Dr. Hnilica's testimony, which were cumulative and grisly, outweighed the slides' probative value. According to the defendant, some of the slides varied only in angle and lighting and were, therefore, cumulative and prejudiced him. He objects that others were identical or depicted old wounds and, therefore, also prejudiced him. He further objects that one slide depicts blood and bruising in the genital area despite a pretrial *in limine* ruling precluding testimony regarding suspected sexual abuse. The defendant argues that the State had already shown "nearly a dozen" photographs of Christian in the hospital examining room and "nearly two dozen" autopsy slides during Hnilica's testimony. This slide served only to inflame the jurors' passions and evoke sympathy for Christian, and the resulting prejudice far outweighed the probative value.

The State argues that the trial judge first reviewed and ruled on the slides' admissibility outside the presence of the jury. The judge then disallowed three slides because they were duplicative of another

and highlighted an old bruise. The State further argues that no slide was used to show sexual abuse and the witness made no reference to sexual abuse. The State contends that the slide is relevant to the cause of death because it showed the injuries to Christian's thighs; her vaginal area is depicted only because it necessarily is included in pictures of the upper leg. The State maintains that the slides are not duplicative, but that they demonstrate the depth of the injuries and different areas of Christian's body. Although some slides show views already introduced in the photographs, they were used to aid the jurors' understanding of Dr. Hnilica's testimony regarding the extent of facial, head, body and pattern injuries and her opinion regarding the cause of death. Moreover, the defendant did not object to the admission of autopsy photos of Christian's head injuries.

■ It is within the discretion of the trial court to allow the jury to view photographs of a victim's injuries, and the decision will not be reversed absent an abuse of discretion. *People v. Terrell*, 185 Ill. 2d 467, 495, 708 N.E.2d 309, 323 (1998). Photographs may be shown to demonstrate "the nature and extent of the injuries, the force necessary to inflict the injuries, the position, location, and condition of the body, and the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness." *Terrell*, 185 Ill. 2d at 495, 708 N.E.2d at 323. In the instant case, the trial judge reviewed the photographs and slides outside the jury's presence, excluded three slides, and only then allowed the slides to be displayed during the autopsy doctor's testimony regarding those issues. The cause of death and Trent's intent were integral to the defense strategy, and Dr. Hnilica was extensively examined and cross-examined regarding the autopsy process, the nature of Christian's injuries and the cause of her death. The jurors then, in deliberation, had to consider the nature and extent of Christian's injuries and the force necessary to inflict those injuries. Accordingly, we conclude that the trial judge did not abuse his discretion when he allowed the photographs and slides to be displayed and entered into evidence.

### 3. Exhibition of the Life-size Photograph of the Victim

The defendant next argues that the circuit court abused its discretion when it allowed the life-size photograph of Christian to be displayed during Hardin's testimony. The defense objected to the photograph's exhibition on the basis that Christian's age, weight and height were not at issue and the prejudicial effect outweighed any probative value. The circuit court denied the objection but did not allow the photograph to go to the jury room during deliberations. The

State responds that the photograph was used for the limited purpose of demonstrating Hardin's testimony. Moreover, the State asserts the victim's size was relevant to establishing Trent's intent.

■ "A 'defendant is presumed to intend the probable consequences of his acts, and great disparity in size and strength between the defendant and the victim, as well as the nature of the injuries, may be considered in this context.' " *People v. Ripley*, 291 Ill. App. 3d 565, 568, 685 N.E.2d 362, 365 (1997), quoting *People v. Rader*, 272 Ill. App. 3d 796, 803, 651 N.E.2d 258, 263 (1995). The defendant maintained that he only intended to discipline the child rather than cause great bodily harm or death. The great disparity in size that existed between Trent and Christian was relevant to Trent's intent and to the severity of the injuries. However, the prosecutor could have elicited such testimony without resorting to such a photograph. Nevertheless, the photograph did not go to the jury during deliberations, a guilty verdict was reasonable in light of the overwhelming evidence presented at trial and the jury would not have reached a different verdict had the photograph been excluded altogether from the trial. Accordingly, we conclude that the circuit court did not commit reversible error.

4. Expert Opinion Testimony as to the Extent of the Injuries

The defendant next contends that the circuit court abused its discretion by allowing Dr. Tillotson to testify that he had never seen a child so badly beaten and Dr. Kirschner to testify that Christian's injuries were among the top 10% of the worst injuries he had ever seen. Trent maintains that the testimony inflamed the passions of the jury and had no probative value to any relevant issue. The State argues that such testimony helped the jury understand the extent of the injuries and refuted Trent's contention that he only used corporal punishment and Christian died as a result of head injuries inflicted by Hardin. The State argues that even if any of the rulings were wrong, any error was harmless because the evidence of Trent's guilt, including his own admissions, was overwhelming.

■ "[I]t is now well settled that a witness, whether expert or lay, may provide an opinion on the ultimate issue in a case. [Citation.] This is so because the trier of fact is not required to accept the witness' conclusion and, therefore, such testimony cannot be said to usurp the province of the jury." *Terrell*, 185 Ill. 2d at 496-97, 708 N.E.2d at 324. In *Terrell*, our supreme court concluded that a police officer's testimony that the victim's injuries were the worst he had ever seen was proper even though it went to an ultimate issue of fact: the exceptionally brutal or heinous nature of the crime. *Terrell*, 185 Ill. 2d at 496, 708 N.E.2d at 324. In the instant case, Tillotson testified

to the brutality of the beating meted out to Christian and the cause of her death. It was then within the jurors' province to weigh this testimony with the rest of the evidence in reaching a verdict. Accordingly, the circuit court did not abuse its discretion in allowing this testimony.

### 5. Hardin's Plea Agreement and the Prosecutor's Opening Statement

The defendant argues that the prosecutor deliberately engaged in misconduct in his opening remarks and, in the testimony of Officer King, presented inflammatory evidence designed to inflame the jurors' emotions. He argues that the prosecutor vouched for Hardin's credibility in his opening statement when he told the jury that the State believed Hardin to be the less culpable of the two defendants. The State responds that the prosecutor's opening remarks concerning Hardin's plea agreement were consistent with the evidence presented, did not ask the jury to infer the defendant's guilt and merely stated what the jury already knew. Moreover, the defense counsel also referred to the agreement in his opening statement.

■ "Evidence of another's guilt is particularly prejudicial to the defendant when the prosecutor is permitted to argue to the jury, explicitly or implicitly, that such evidence may be considered by them in determining the guilt of the defendant." *People v. Sullivan*, 72 Ill. 2d 36, 43, 377 N.E.2d 17, 21 (1978). "However, a prosecutor may comment on a witness' credibility [citation] and challenge a defendant's credibility and defense theory when such remarks are based on facts in evidence or reasonable inferences drawn therefrom. [Citation.]" *People v. Pope*, 284 Ill. App. 3d 695, 706, 672 N.E.2d 1321, 1328 (1996). Additionally, a prosecutor's remarks require reversal only when they result in substantial prejudice to the defendant. *People v. Pasch*, 152 Ill. 2d 133, 199, 604 N.E.2d 294, 315 (1992). In the instant case, we see no reason for the prosecutor's disclosure that Hardin was less culpable than Trent, nor do we understand the State's assertion that it was a fact the jury already knew. However, the defense counsel also mentioned the plea agreement and commented on Hardin's credibility in opening argument when, after referring to Hardin's reason for testifying, he immediately commented on the jury's duty to assess the credibility of the witness. The jurors knew that Hardin and Trent each had reasons for testifying. They had the opportunity to observe each and weigh their credibility. In these circumstances, we conclude that the statement did not substantially prejudice the defendant and, accordingly, does not warrant reversal.

### 6. Hearsay Testimony

■ Trent contends that the trial judge allowed impermissible

hearsay when he allowed Officer King to testify that Hardin told him at the police station that she feared Trent. He argues that the testimony substantially prejudiced him and, therefore, requires reversal. The State argues that King's testimony was not offered for its truth nor did King testify that he believed it; therefore, it did not constitute impermissible hearsay. Moreover, the defense counsel had the opportunity to impeach Hardin on cross-examination; thus, any error was harmless and, given the overwhelming evidence of guilt, Trent did not suffer substantial prejudice as a result of the prosecutor's isolated comment or King's testimony. " 'Hearsay evidence is testimony in court ***, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' [Citations.] *** [T]he essential feature, without which testimonial offerings must be rejected, is the opportunity for cross-examination of the party whose assertions are offered to prove the truth of the [matter] asserted." *People v. Carpenter*, 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741 (1963). King testified that he had monitored the meeting between Hardin and Trent because Hardin expressed concerns for her safety. The judge sustained the defense counsel's objection and later instructed the jury to disregard any questions to which an objection had been sustained. Moreover, even if the testimony was elicited to assert the truth that Hardin feared for her safety, Hardin herself testified, and the defense counsel cross-examined her. In light of the opportunity for cross-examination and the jury instructions, we conclude that King's testimony did not substantially prejudice Trent and does not require reversal.

C. Public Act 89—203

▇ The defendant also argued to this court that Public Act 89—203, under which the circuit court sentenced him and which mandates a life sentence for the murder of a child, violates the Illinois Constitution's single subject clause (Ill. Const. 1970, art. IV, § 8(d)) and denied him due process of law under the Illinois Constitution's "rehabilitation clause" (Ill. Const. 1970, art. I, § 11).

Our supreme court has recently concluded that Public Act 89—203 violates the single subject clause of the Illinois Constitution. *People v. Wooters*, 188 Ill. 2d 500 (1999). Therefore, we vacate the defendant's sentence and remand this cause to the circuit court for resentencing under the law in effect prior to the enactment of Public Act 89—203. See *People v. Gersch*, 135 Ill. 2d 384, 390, 553 N.E.2d 281, 283 (1990).

## CONCLUSION

In sum, we conclude that (1) the defendant was not denied effec-

454

tive assistance of counsel when his counsel employed the strategy available under the circumstances; and (2) the circuit court either did not abuse its discretion in its evidentiary rulings or such abuse did not substantially prejudice the defendant and, therefore, does not require reversal. Accordingly, we affirm the conviction but remand for resentencing in accordance with the ruling in *Wooters*.

Affirmed and remanded.

HOLDRIDGE and HOMER, JJ., concur.